**CATHODIC PROTECTION SERVICE, Plaintiff-Appellee,**

v.

**AMERICAN SMELTING & REFINING COMPANY, Federated Metals Corporation and Waynes Broyles Engineering Company, Defendants-Appellants.**

No. 76–4134.

United States Court of Appeals, Fifth Circuit.

May 7, 1979.

Rehearings Denied July 2, 1979.

Ned L. Conley, Elliott Cox, Houston, Tex., for defendants-appellants.

Michael P. Breston, Houston, Tex., for plaintiff-appellee.

Before GEE and VANCE, Circuit Judges, and HUNTER, District Judge.*

VANCE, Circuit Judge:

I

## Case Orientation

Cathodic Protection Service (Cathodic), filed this action on July 28, 1972, in the District Court for the Southern District of Texas alleging infringement of United States Letters Patent 3,616,422 (the original patent). The original patent, entitled "Galvanic Anode," was issued on October 26, 1971, on an application filed April 21, 1971. It covers a galvanic anode adapted for the cathodic protection of relatively large diameter pipelines submerged in water.

On September 26, 1973, Cathodic filed an amended complaint alleging infringement of United States Letters Patent Re 27,529 (the reissue patent) which is the patent involved in this suit. The latter patent, which is a reissue of the original patent, was issued on December 19, 1972, on an application filed August 7, 1972. Both the reissue patent and the original patent were issued to Cathodic as assignee of Gordon L. Doremus and Jack G. Davis.

In this suit·Cathodic accuses Waynes Broyles Engineering Company (Broyles) of infringement and American Smelting & Refining Company (ASARCO) of contributory infringement and of actively inducing infringement by Broyles. ASARCO,[1] a primary supplier of zinc, makes and sells zinc galvanic anodes. Broyles offers a complete cathodic protection service and distributes zinc galvanic anodes for ASARCO. Broyles and ASARCO counterclaimed seeking a declaration, (1) that the reissue patent is invalid, (2) that Cathodic competed unfairly with them by bringing this action, and (3) that Cathodic violated the antitrust laws by attempting to enforce the reissue patent.

Trial before the court commenced on January 16, 1975, and lasted until January 23. The court entered its original findings of fact and conclusions of law and judgment on February 12, 1976.[2] On February 23, 1976, ASARCO and Broyles moved for new trial or in the alternative for amended findings of fact and conclusions of law. They specifically requested that the finding of treble damages be reserved until after an accounting. A memorandum and order was entered on August 3, 1976, denying defendants' post-trial motion. The court agreed, however, to hold the treble damage question until the time of the accounting.

On October 8, 1976, revised findings of fact and conclusions of law and a judgment were entered. The court ruled that the reissue patent was valid and infringed and entered judgment enjoining Broyles and ASARCO from further infringement. The counterclaim was dismissed in its entirety. ASARCO and Broyles appealed this ruling pursuant to 28 U.S.C. § 1292(a)(4).

II

## Factual Orientation

The patent in issue covers a galvanic bracelet anode, which acts as a self-generat-

---

* District Judge, of the Western District of Louisiana, sitting by designation.

1. Federated Metals Corporation is a division of ASARCO. Those companies will be collectively denominated ASARCO.

2. In its original findings of fact and conclusions of law the court held the reissue patent valid and infringed, and entitled Cathodic to recover from ASARCO and Broyles treble damages for infringement.

ing current battery when suitably mounted around underwater offshore pipelines. As described in its claim one, Cathodic's bracelet[3] consists of a pair of semicylindrical segments that are fitted around the pipe to form a full circle. Each segment has a cathodic core consisting of a pair of concentric steel bars that are entirely embedded within the anode body and adjacent to its inner periphery. The bars extend out the opposite longitudinal edges of the body where they are welded together to hold the bracelet on the pipe. Within the semicylindrical anodes, the cathodic cores are connected by angularly-spaced interlinking metal rods.[4]

Galvanic anodes are used to protect objects made of other metals, or cathodes, from corrosion. When the anode and the object to be protected are connected and submerged in a medium that conducts electricity, a small electric current begins to flow from one object to the other. This electric current impedes the corrosion process and can extend the useful life of pipelines forty years or longer. Such pipelines are usually covered with a protective coating to prevent corrosion. Anodes are fastened to them as a precaution against a failure of the coating; then the pipelines are usually coated with concrete to keep them submerged.

Galvanic anodes of different shapes and sizes for land and marine use have been known for many years, and have been marketed by Cathodic, Broyles, and others since approximately 1958. Many prior patents on the cathodic protection art have been issued.[5] ASARCO has been a major supplier of zinc anode bodies for galvanic anodes since the anodes' conception.

Cathodic conceived its patented bracelet in 1968 and began manufacturing and marketing the bracelet early in 1969. Cathodic, Broyles and other people in the cathodic protection business, however, continued to market the old segmented designs.

Early in 1972 Broyles' customers began asking whether they could purchase anodes with a semicylindrical design. Broyles was aware of Cathodic's patent and conceived an alternate design, which, Broyles was satisfied, did not infringe Cathodic's patent. The customers accepted the alternate design, and Broyles began ordering zinc for the anode segments from ASARCO. AS-ARCO furnished Broyles anode segments, which Broyles assembled and sold to its customers.

When these anodes were being shipped, Cathodic had only the original United States patent No. 3,616,422, which had been issued on October 26, 1971. *All* of the claims of this original patent were limited in the scope of their coverage to anodes that included the following:

(a) a *continuous semi-cylindrical* body of a galvanic anode metal, and

(b) a core, which is cathodic to the anode metal concentrically embedded entirely within the anode metal adjacent the inner periphery, in each segment is made up of

(1) at least two axially-spaced metal bars having

(2) *plurality of angularly-spaced metal rods* interlinking the bars.

The anode designed and sold by Broyles used a quarter-circle segment of galvanic

---

**3.** Claim 1 of the United States Letters Patent Re 27,529 contains a description of the basic structure of Cathodic's anode.

**4.** Claim 6 of Patent Re 27,529 omits the angularly-spaced interlinking metal rods, making their inclusion in this anode unnecessary. Claim 7 changes the continuous semi-cylindrical body wording of claim 1 to a continuous arcuate body, indicating that this anode need not be semicylindrical, but may be comprised of a pair of arcuate segments. Claim 13 changes the wording so that the body may be

comprised of a plurality of arcuate segments rather than a pair.

**5.** The district court made this finding of fact (Finding of Fact 5) and additionally found

A typical, practical anode is comprised of a body of anodic metal (magnesium, zinc, or aluminum) containing a cathodic metal core which is largely embedded therein. The anodic metal is attached to the iron or steel body in such a way that a small electric current can pass between the anode and the body to be protected.

anode material, instead of a semicylindrical body, and its core did not include any angularly spaced metal rods.

Cathodic, however, learned of the Broyles transaction and promptly accused Broyles of infringing its patent. The concerned parties discussed the problem, but Cathodic continued to insist that the patent was infringed and eventually filed the original complaint in this suit.

Ten days after suit was filed, Cathodic filed an application to reissue the patent with claims that were much broader than the claims of the original patent[6] because they covered anodes (1) whether or not semicylindrical and (2) without the angularly spaced metal rods interlinking the bars of the core.[7]

By this time ASARCO had examined the file wrapper[8] of Cathodic's original patent and discovered that Cathodic had failed to disclose to the Patent Office material prior art with which it was familiar. The prior art had also not been cited by the Patent Office. ASARCO promptly gave Cathodic notice not only of prior art, which was already known to Cathodic, but also of additional art, which had been found in searches made by ASARCO. This notice, which was made of record in this case pursuant to 35 U.S.C. § 282, was given for the purpose of allowing Cathodic the opportunity of disclosing the prior art to the Patent Office examiner while he was considering the reissue application.

Cathodic did not disclose any of the additional prior art to the examiner; thus the reissue patent issued without the examiner having been informed of the additional prior art.[9]

The claims in Reissue Patent 27,529 are crucial to the ultimate issue and therefore are set out in full:

What we claim and desire to secure by Letters Patent is:

1. A galvanic anode for cathodic protection of pipe lines, comprising:

(a) a pair of semicylindrical segments adapted to embrace a pipeline, each segment comprising:

(1) a continuous, semicylindrical body of a galvanic anode metal;

(2) A metal core cathodic to the anode metal concentrically embedded entirely within the anode metal adjacent the inner periphery of said body;

(2) said core comprising:

(a) at least two axially-spaced, parallel metal bars;

(b) a plurality of angularly-spaced metal rods interlinking said bars; and

(c) each of said bars having end portions projecting from opposite, longitudinal edges of the anode body to form joint elements for connecting one of said segments to the other in pipe-embracing relation.

2. An anode according to claim 1 wherein said anode metal is a member selected from the group consisting of aluminum, zinc, magnesium, and alloys thereof.

3. An anode according to claim 1 wherein said core is constructed of mild steel.

4. An anode according to claim 1 including electric current conductor elements connected to said core for electrically connecting the core to the pipeline.

---

6. Compare the alleged infringing anodes and the patented anode, Re 27,529, as described in Claims 7 and 13.

7. See Footnote 4.

8. A file wrapper is the file containing all documents, communications and actions taken by the patentee and the Patent Office with regard to the patent application.

9. The Section 282 Notice of Prior Art was filed with the district court on October 30, 1972. The prosecution of the reissue application on

its merits was closed by the Patent Officer Examiner on September 20, 1972. Cathodic has seemingly urged this chronology of events as an excuse for its failure to submit this prior art to the patent office. *Veritatis simplex oratio est.* It was Cathodic's responsibility to submit prior art to the patent office not ASARCO's or Broyles', and the lateness of ASARCO's and Broyles' attempt to help is no excuse for Cathodic's irresponsibility.

5. An anode according to claim 1 wherein one of said end portions is offset laterally to receive the non-offset end portion of an opposed bar to form the joint therebetween.

6. A galvanic anode for cathodic protection of pipelines, comprising:

(a) a pair of semi-cylindrical segments adapted to embrace a pipeline, each segment comprising:

(1) a continuous, semicylindrical body of a galvanic anode metal;

(2) A metal core cathodic to the anode metal concentrically embedded entirely within the anode metal adjacent the inner periphery of said body;

(3) said core comprising:

(a) at least two axially-spaced, metal bars; and

(b) each of said bars having end portions projecting from opposite, longitudinal edges of the anode body to form joint elements for connecting one of said segments to the other in pipe-embracing relation.

7. A galvanic anode for cathodic protection of pipe lines, comprising:

(a) a pair of arcuate segments adapted to embrace a pipe line, each segment comprising:

(1) a continuous, arcuate body of a galvanic anode metal;

(2) A metal core cathodic to the anode metal concentrically embedded entirely within the anode metal adjacent the inner periphery of said body;

(3) said core comprising:

(a) at least two, axially-spaced metal bars;

(b) each of said bars having end portions projecting from opposite longitudinal edges of the anode body to form joint elements for connecting one of said segments to the other in pipe-embracing relation.

8. A galvanic anode according to claim 7, and

a plurality of angularly-spaced metal rods interlinking said bars.

9. An anode according to claim 7, wherein said anode metal is a member selected from the group consisting of aluminum, zinc, magnesium, and alloys thereof.

10. An anode according to claim 7, wherein said core is constructed of mild steel.

11. An anode according to claim 9, including electric current conductor elements connected to said core for electrically connecting the core to the pipeline.

12. An anode according to claim 11, wherein one of said end portions is offset laterally to receive the non-offset end portion of an opposed bar to form the joint therebetween.

13. A galvanic anode for cathodic protection of pipelines comprising:

a plurality of arcuate segments adopted to embrace a pipeline, each segment comprising:

(1) a continuous, arcuate body of a galvanic anode metal;

(2) a metal core cathodic to the anode metal concentrically and entirely embedded within the anode metal adjacent the inner periphery of said body;

(3) said core comprising:

(a) at least two, axially spaced-apart metal bars;

(b) each of said bars having end portions projecting from the opposed longitudinal edges of the said segments to form joint elements for connecting said segments to each other in pipe-embracing relation.

14. The anode according to claim 13, and

at least one metal rod in each segment for interlinking said bars.

References Cited

The following references, cited by the Examiner, are of record in the patented file of this patent or the original patent.

UNITED STATES PATENTS

2,303,778  12/1942  Wesley _____ 204—197 XR
2,656,314  10/1953  Osterheld _____ 204—197

---

OTHER REFERENCES

Cathodic Protection of Submarine Pipelines, 2 pp. pub. by Federated Metals Div. (1958).

FREDERICK, C. EDMUNDSON, Primary Examiner

ASRCO and Broyles contend that all fourteen claims are invalid because the subject matter defined by these claims is obvious under 35 U.S.C. § 103.

## III

### Legal Orientation

■■■■ Once a patent has been issued it is presumed to be valid. The burden of establishing its invalidity rests with the party challenging the patent. 35 U.S.C. § 282.[10] This presumption is founded on the understanding that patent approval is a species of administrative determination supported by evidence. Consequently, in an infringement suit, when the defense of invalidity of the patent is raised on the ground that prior art was not submitted to the patent office, the foundation for the presumption vanishes, the presumption itself is severely weakened, and the court is required to scrutinize the patent more closely. *Zero Manufacturing Co. v. Mississippi Milk Producers Association*, 358 F.2d 853 (5th Cir.), *cert. denied*, 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966); *Cornell v. Adams Engineering Co.*, 258 F.2d 874 (5th Cir. 1958).

■■ Cathodic presented no prior art to the patent office except Bulletin 191. Bulletin 191 is a publication circulated by AS-ARCO that describes an unpatented anode commonly known in the cathodic protection field. We, therefore, must consider the prior art against Cathodic's patent without the presumption in favor of its validity.

The conditions of patentability are set forth in the Patent Act in three sections, 35 U.S.C. §§ 101, 102 and 103. Sections 101 and 102 express the newness and usefulness tests.[11] Section 103 expresses the nonobvi-

10. § 282. Presumption of validity; defenses
A patent shall be presumed valid. Each claim of a patent (whether in independent or dependent form) shall be presumed valid independently of the validity of other claims; dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it.

11. Title 35 U.S.C. § 101. Inventions patentable
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
Title 35 U.S.C. § 102. Conditions for patentability; novelty and loss of right to patent
A person shall be entitled to a patent unless—
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
(c) he has abandoned the invention, or
(d) the invention was first patented or caused to be patented, or was the subject of an inventor's certificate, by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application for patent or inventor's certificate filed more than twelve months before the filing of the application in the United States, or
(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent, or
(f) he did not himself invent the subject matter sought to be patented, or
(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of in-

ousness test with which we are most concerned:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Six Supreme Court opinions, which have dealt with the subject of invention in the last three decades, guide our determination. They extend from *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), to *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976). The first opinion after *A & P*, and the first to specifically treat the nonobviousness language in Section 103, was *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). It was accompanied by *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). This duo was followed by *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), *Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976), and *Ag Pro* in 1976. These cases have fleshed out the requirements that nonobviousness imposes on a determination of patentability. The difficulty of applying the requirements to specific fact situations, however, can be equated to the difficulty of invention. In this atmosphere we are mindful of the language of Mr. Justice Frankfurter, dissenting in *Shapiro v. United States*, 335 U.S. 1, 56, 68 S.Ct. 1375, 1403, 92 L.Ed. 1787 (1948), "It is the part of wisdom, particularly for judges, not to be victimized by words."

The Supreme Court first outlined in *Graham v. John Deere Co., supra*, 383 U.S. at 17–18, 86 S.Ct. at 694, the nature of the inquiry required under § 103:

While the ultimate question of patent validity is one of law, *Great A. & P. Tea Co. v. Supermarket Equipment Corp.*, supra, 340 U.S. at 155, 71 S.Ct. at 131, the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

In *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the court referred to the test in *Graham* as a "demanding standard of invention." *Id.* at 676, 89 S.Ct. 1902. In *Anderson's-Black Rock* the court reiterated the test enunciated in *Graham* and emphasized that " 'strict observance' of those requirements is necessary." *Anderson's-Black Rock v. Pavement Salvage Co., supra*, 396 U.S. at 62, 90 S.Ct. at 308.

■■ The district court's findings with regard to the "factual inquiries" demanded by *Graham* must be reviewed under the clearly erroneous standard of Federal Rule of Civil Procedure 52(a).[12] The ultimate issue of obviousness is, however, a question

---

vention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

12. *See Stamicarbon, N. V. v. Escambia Chemical Corp.*, 430 F.2d 920 (5th Cir.), *cert. denied*, 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). *See also Metal Arts Co. v. Fuller Co.*, 389 F.2d 319 (5th Cir. 1968).

of law,[13] not of fact. *See, e. g., Graham v. John Deere Co., supra.*

■ Our comparison of the present case with the reported authorities and our examination of the voluminous record before us convinces us that the district court's first and third factual findings under *Graham* were clearly erroneous and that the court erred in its conclusion that the reissue patent was valid. Cathodic's reissue patent does not satisfy the test of nonobviousness. Our conclusion that Patent Re 27,529 is invalid on this ground completely disposes of the appeal and obviates our consideration of the other issues. *See Waldon, Inc. v. Alexander Manufacturing Co.*, 423 F.2d 91 (5th Cir. 1970); *Zero Manufacturing Co. v. Mississippi Milk Producers Association, supra.*

## IV

### Scope and Content of Prior Art

The three factors emphasized in *Graham* must guide our examination of the district court's findings of fact and conclusions of law. Although the district court did not verbalize a specific finding as to the scope of the prior art, we find the court's comments on the relevance of the prior art submitted by ASARCO to be equivalent to such a determination:

A review of the prior art cited by defendants to plaintiff, pursuant to 35 U.S.C. § 282, or to this Court, reveals the lack of relevance or materiality of such art, and demonstrates that because of the nature of the invention and the usage requirements in the industry, only the Bulletin 191 anode is pertinent. Plaintiff's refusal to cite as pertinent other prior art than Bulletin 191 to the Patent Examiner in submitting the applications for the original and reissue patents is therefore of no consequence.[14]

■ The district court's conclusion that only the Bulletin 191 anode was relevant prior art[15] was a fundamental error. The prior art that must be considered includes not only all prior art in the field of cathodic protection, but also all prior art in analogous fields. *See Mandel Bros. v. Wallace*, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12 (1948); *Gerner v. Moog Industries, Inc.*, 383 F.2d 56 (8th Cir. 1967), *cert. denied*, 390 U.S. 922, 88 S.Ct. 855, 19 L.Ed.2d 981 (1968).[16]

13. *Kiva Corp. v. Baker Oil Tools, Inc.*, 412 F.2d 546 (5th Cir.), *cert. denied*, 396 U.S. 927, 90 S.Ct. 262, 24 L.Ed.2d 226 (1969); *Swofford v. B & W, Inc.*, 395 F.2d 362 (5th Cir.), *cert. denied*, 393 U.S. 935, 89 S.Ct. 296, 21 L.Ed.2d 272 (1968).

14. Finding of Fact 34.

15. Conclusion of Law 14.

16. The Supreme Court indicates that it gives wide latitude to its finding on the scope of the prior art in its discussion of systems using flowing water to clean animal wastes from barn floors.

Among the labors of Hercules is the following:

"Heracles now set out to perform his fifth Labour, and this time his task was to cleanse the stables of Augeas in a single day. Augeas was a rich king of Elis, who had three thousand cattle. At night the cattle always stood in a great court surrounded with walls, close to the king's palace, and as it was quite ten years since the servants had cleaned it out, there was enough refuse in the court to build up a high mountain. Heracles went to Augeas and asked if he would give him the tenth part of his flocks if he thoroughly cleansed his stables in a single day. The king looked upon this as such an absolutely impossible feat that he would not have minded promising his kingdom as a reward for it, so he laughed and said, 'Set to work, we shall not quarrel about the wages,' and he further promised distinctly to give Heracles what he asked, and this he did in the presence of Phyleus, his eldest son, who happened to be there. The next morning Heracles set to work, but even his strong arms would have failed to accomplish the task if they had not been aided by his mother-wit. He compelled a mighty torrent to work for him, but you would hardly guess how he did it. First he opened great gates on two opposite sides of the court, and then he went to the stream, and when he had blocked up its regular course with great stones, he conducted it to the court that required to be cleansed, so that the water streamed in at one end and streamed out at the other, carrying away all the dirt with it. Before evening the stream had done its work and was restored to its usual course." C. Witt, Classic Mythology 119–120 (1883).

*Sakraida v. Ag Pro, Inc., supra,* 425 U.S. at 275 n. 1, 96 S.Ct. at 1534 n. 1. *See also Fred Whitaker Co. v. E. T. Barwick Indus., Inc.*, 551 F.2d 622 (5th Cir. 1977).

We are of the same general opinion as is the eighth circuit:

> "prior art" may include not only earlier devices and publications but also similar devices whether or not in related areas to the patented device and with respect to a simple mechanical device utilizing universally known principles permits referring to the field of mechanics itself.

*Skee-Trainer, Inc. v. Garelick Manufacturing Co.*, 361 F.2d 895, 898 (8th Cir. 1966).

The prior art submitted by ASARCO and Broyles is extremely relevant. Not only is the art from the field of galvanic anodes, but it also discloses the same functional or mechanical features that Cathodic claims in its patent. Mr. Doremus, the original patent holder; his attorney, Mr. Werlin; Mr. Cockfield, the searcher; and the Patent Office examiner believed the relevant field of art to be broader than did the district court.

Mr. Doremus, a noted expert in the field, testified about the type of information that should be considered in designing a cathodic protection system and the places one would look to find this information. In his testimony, he conceded that the scope of relevant art studied in designing a galvanic anode for cathodic protection of underwater pipelines would not be limited to Bulletin 191:

Q During this twenty-odd years, twenty-five years or so that the company has been in business, they have designed galvanic anodes for a number of different kinds of structures, haven't they?

A Yes, indeed.

Q And that's underwater structures, as well as underground structures, is that correct?

A Yes.

Q And how about equipment which is used in the refineries and chemical plants, and that sort of thing? Have you designed galvanic anode systems for those?

A Yes.

Q And due to your work with this equipment it's necessary to make some sort of study of the equipment and become familiar with it, isn't it?

A That's true.

Q So over the many years that you have been in this business, well, you must have gained considerable familiarity with a large number of different kinds of equipment, isn't that correct?

A Yes, sir.

Q And this is the sort of thing that any cathodic protection engineer necessarily becomes familiar with in the course of his everyday business, isn't it?

A If he's good.

. . . . .

Q Now, when you design such systems, do you try to draw upon all of this background of experience that you have in order to be able to design the best possible system in each application?

A Well, your mind screens out a large area, depending on the project you are working on. So your mind limits you to certain anodes or systems or components that are pertinent to the project you have in mind, be it a water tank, or a pipeline. You wouldn't consider everything in the field every time you approach a given design problem.

. . . . .

Q All right, well, let's go to something with the same environment, then. Suppose we are talking about an offshore platform. Do you ignore what knowledge you have of anodes for offshore platforms in designing anodes for pipelines?

A Well, not completely, of course, because you are quite close together. You are in a marine environment in both cases.

Q And how about pilings, isn't that information which you would take into account?

A Anodes for pilings?

Q Yes.

A Yes, sir.

Q And equipment which handles sea water, is that information which you would take into account?

A Yes.

Q And anytime you have any kind of structure which is of similar shape and your problem is one of geography or configuration, don't you necessarily take into account the experience and knowledge that you have concerning other structures of similar configuration and geography?

A Yes. This is my point, you take into account something that is applicable and you subconsciously screen out things that are not applicable.

Mr. Werlin described the areas in which a patent examiner would be expected to look in determining the disclosures and, hence, the relevance of prior art. Mr. Werlin specifically testified to the places in which he presumed Mr. Cockfield, the searcher employed by Werlin, had searched for relevant prior art. Mr. Werlin also conceded that many patents discarded by the district court were relevant:

Q But he [patent office examiner] wouldn't just look under the class under which bracelet anodes for underwater pipelines may be classified in order to determine whether a bracelet anode for an underwater pipeline is a patentable structure, would he?

A No, I don't think so.

Q He might look in sub-classes where other things for underwater pipelines are classified, might he not?

A He might.

Q He might look in sub-classes where other kinds of anodes are classified, might he not?

A Yes.

Q As a matter of fact, Mr. Cockfield did that, didn't he, when he made the search for you?

A I'm sure he must have.

. . . . .

Q He would know to search in the places where relevant art might be found, wouldn't he?

A I would suspect so.

Q I hand you a copy of Defendants' Exhibit 32, which is a book of patents, and the four patents in there with the orange tabs are, I believe, patents which were sent to you by Mr. Cockfield, is that right, Patents Nos. 1,664,800, 2,882,213, 3,001,924, and 3,240,512.

. . . . .

Q Did you look at these patents when they were first sent to you?

A I'm sure I must have.

. . . . .

Q Now, semi-cylindrical zinc anodes are relevant to the subject matter that is to be patented, isn't that right?

A Yes.

. . . . .

Q It [Douglas Patent] would be, then— you would agree that that's relevant to the subject matter, to the patentability of the subject matter of your patent, is that right?

A Yes, I would assume any—almost any anode would be.

. . . . .

Q And your answers with respect to the Battis patent, if I were to ask the same series of questions that I did about the Douglas patent, would be essentially the same, isn't that correct?

A Yes.

. . . . .

Q Now, look at the next two patents in the book there, with the white tabs on them, the patents for Wesley, No. 2,303,778, and 2,656,314, Osterheld, O-s-t-e-r-h-e-l-d. Do you recognize those as the patents that the patent office cited in the first office action on your application?

A . . . . Yes, those were cited by the patent office.

. . . . .

Q  And what did he say that they were cited to show?

A  "Claim 6 is rejected under the 35 U.S.C. 103 as unpatentable over Bulletin 191 alone, or in view of Wesley or Osterheld.["]  And Claim 6 is limited to where the end portions are offset laterally, the offset portions on one of the anodes is offset to receive the non-offset end portion of an opposed bar.  It's simply on the form of the connection between the pieces that stick out of the anodes.  And that's what he cited it against.

As is evident from Mr. Werlin's testimony, his searcher, Mr. Cockfield, determined that more prior art was relevant than the Bulletin 191.

In addition to Bulletin 191, the patent office examiner at least considered the Wesley and Osterheld patents to be relevant.  In fact the examiner found these patents to be so relevant that initially he rejected one of the original claims and eight of the reissue claims based on these patents.

Claim 6 is rejected under 35 U.S.C. 103 as unpatentable over Bulletin 191 alone or in view of Wesley or Osterheld.  "One" of said end portions is off-set laterally" is not considered to differentiate from the teaching of Bulletin 191.  However, even if it did, it is obvious from the secondary references that broadly shaping end portions to fit abutting portions is practiced on the art.

.    .    .    .    .

Claims 7–14 are rejected under 35 U.S.C. 103 as unpatentable over R.[17]

17. R is the designation given to the prior art references considered by the patent office examiner.  The prior art references considered by the patent office examiner were the Bulletin 191, Wesley and Osterheld Patents.  In the file wrapper for Reissue Patent Re 27,529, at page 23, we find a reference in Part III, entitled Notification of Rejection(s) and/or Objection(s) (35 U.S.C. § 132), to R:

R discloses segmented anodes surrounding the pipe to be protected.

R discloses the exact reasons that Claims 7–14 were initially rejected by the patent examiner.  See footnote 4.

18. The district court made the following findings of fact:

The district court recognized that the Wesley Patent and Osterheld Patent had been cited by Cathodic to the patent examiner;[18] however, it erroneously excluded these patents and the other patents cited by ASARCO and Broyles from the scope of the prior art to be considered..  This fundamental error tainted the remaining findings of fact and ultimately foreclosed the correct conclusion of law.

V

*Differences Between Claims at Issue and Prior Art*

We hold that obviousness is established when features that distinguish the patented anode from the closest prior art reference are disclosed in analogous structures in which these features perform an identical function.  *See Mannix Co. v. Healey*, 341 F.2d 1009 (5th Cir. 1965).  This position is also expressed by the Patent Office in its Manual of Patent Examining Procedure:

706.02  Rejection on Prior Art

[Reprint of 35 U.S.C. § 102 and 35 U.S.C. § 103]

By far the most frequent ground of rejection is on the ground of unpatentability in view of the prior art, that is, that the claimed matter is either not novel under 35 U.S.C. 102, or else it is obvious under 35 U.S.C. 103.  The language to be used in rejecting claims should be unequivocal.  See § 707.07(d).

.    .    .    .    .

37.  .    .    .

The patent to Wesley does disclose a means of combatting underground corrosion electrochemically, and plaintiff did cite this prior art to the Patent Examiner in its application for the reissue patent.  .    .    .

.    .    .    .    .

39.  .    .    .

The patent to Osterheld does disclose a connection from the anodic to the cathodic metal, and plaintiff did cite this prior art to the Patent Examiner in its application for the reissue patent.  .    .    .    .

35 U.S.C. 103 (Obviousness)

In contrast, 35 U.S.C. 103 authorizes a rejection where to meet the claim, it is necessary to modify a single reference or to combine it with one or more others.

Once the art in which the ordinarily skilled person must be said to have knowledge is widened to include most of the other cathodic protection anodes, it is manifest that the patent claims here are obvious. They simply do not describe a cathodic anode that performs functions different from those performed by the prior art. Although Cathodic's anode may achieve those functions in a slightly more efficient manner, the functions themselves were well established in the wider cathodic protection field. The improved performance that resulted from reduction in the number of anode segments and elimination of external bands was hardly unanticipated. It was readily predictable when those changes, performing the same function that they were performing in other prior art, were applied to the Bulletin 191 anode.

Although the district court erroneously limited its scope, it did make findings of fact with regard to that prior art. Viewing these findings in the light of a correct determination of the relevance of prior art we find that Cathodic may have an improved product, but not an innovatively different one.[19] All of the differences that the district court found between the Bulletin 191 anode and Cathodic's patented anode are shown to be functioning in the exact manner in the prior art as they function in Cathodic's patented anode:

> "[U]nless more ingenuity and skill . . were required . . . than were possessed by an ordinary mechanic acquainted with the business, there [is] an absence of that degree of skill and ingenuity which constitutes essential elements of

every invention. In other words, the improvement is the work of the skillful mechanic, not that of the inventor." *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683, 691 (1851), *quoted with approval in Sakraida v. Ag Pro, Inc.,* 425 U.S. at 279, 96 S.Ct. at 1537.

*Robbins Co. v. Dresser Industries, Inc.,* 554 F.2d 1289, 1294 (5th Cir. 1977). Similarly, the record before us discloses innovations that are the work of a skilled mechanic rather than an inventor.

The district court's findings of fact concerning the disclosures of the prior art, however, are not clearly erroneous and are therefore controlling. Fed.R.Civ.P. 52(a). The pertinent parts of these findings,[20] set out in full in Appendix 1 to this opinion, demonstrate that each element of Cathodic's patented anode, which the district court found to be absent in the Bulletin 191, is clearly disclosed in the prior art.

Both Mr. Doremus and Mr. Werlin specifically testified that some of the prior art showed structural features cited by the district court in finding that Cathodic's anode "differed from the Bulletin 191 anode by having cores concentric to the pipeline, by having no external bands to secure the anode to the pipe and by reducing the number of segments per bracelet."[21] Pertinent parts of the testimony of Mr. Doremus, Mr. Werlin, and Dr. Pennington, ASARCO's and Broyles' expert, are set out in Appendix 2. The testimony adds to the findings of the district court and substantiates our conclusion that all of the elements of Cathodic's bracelet anode were very old, and were disclosed to be functioning in the prior art in the same manner as in Cathodic's anode.

It was readily apparent to those skilled in the art that one way of securing an anode to the subject to be protected is by using extending internal cores thus eliminating

**19.** In *Graham, supra,* the Supreme Court opined that the fifth circuit was incorrect in holding the patent valid on the basis that the combination produced an old result in a cheaper and otherwise more advantageous way. In short, result-oriented reasoning was not to be enough. The Court insisted, "The emphasis on

non-obviousness is one of inquiry, not quality . . . ." *Graham v. John Deere Co., supra,* 383 U.S. at 17, 86 S.Ct. at 693–694.

**20.** Findings of Fact 35–45.

**21.** Finding of Fact 10.

the necessity of external bands. The semi-cylindrical design was within the skill of the art as were the entirely embedded cores with interlinking steel rods. *Facile est inventis addere.*

## VI

### *Level of Ordinary Skill in the Art*

When a claim is not anticipated by a prior art example, the level of ordinary skill in the pertinent art must be resolved. Although it did not deal in detail with the level of ordinary skill in the pertinent art, the district court held,

> In the insular world of cathodic protection of large offshore pipelines, plaintiff's novel invention is not anticipated by any prior art, and nothing in any prior art patent or combination of patents enables a person skilled in the art to construct plaintiff's invention. Without utilizing the teachings of plaintiff's patent, such a person could not rely solely upon the teaching of prior art patents to combine or modify such patents in the manner disclosed in the instant suit. Indeed, utilizing such prior art, especially the most pertinent prior art, the Bulletin 191 anode, persons in the industry looked toward use of stronger external bands as the next trend in development.[22]

. . . Against the background of the scope and content of the prior art and the level of ordinary skill in the art, the claimed subject matter of the patent in suit was not obvious to a man of ordinary skill in the art at the time the invention was made and was not anticipated by prior art, whether the prior art asserted is taken singly, or in combination.[23]

To the extent that this holding constitutes a finding of fact with regard to the level of ordinary skill in the art, it is clearly erroneous.

The level of ordinary skill step requires a preliminary determination: what prior art is to be used by the hypothetical person skilled in the art? This preliminary determination's significance was illustrated in the *Calmar v. Cook Chemical* and *Colgate-Palmolive v. Cook Chemical* section of the *Graham v. John Deere Co.* opinion. In *Graham* the patentee of a pump sprayer invention argued that a particular patent was not in the pertinent prior art because it related to containers having pouring spouts rather than pump sprayers. The court disposed of that argument—and the Cook patent—by responding that "[t]he problems confronting [the patentee] and the insecticide industry were not insecticide problems; they were mechanical closure problems. Closure devices in such a closely related art as pouring spouts for liquid containers are at the very least pertinent references. See, II Walker on Patents § 260 (Deller ed. 1937)." *Graham v. John Deere Co., supra,* 383 U.S. at 35, 86 S.Ct. at 703.

The hypothetical person is a mechanically skilled individual familiar with the design of devices in the industry. *See Robbins Co. v. Dresser Industries, Inc., supra; Systematic Tool & Machine Co. v. Walter Kidde & Co.,* 555 F.2d 342 (3rd Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 128 (1977). By eliminating the pertinent prior art the district court unduly restricted its view of the ordinary skill in the art. Had the district court correctly made the initial determination, it would have charged the person of ordinary skill with the knowledge disclosed in this pertinent prior art. Only then would the court have been in a position to decide whether application of the references and uses from the pertinent prior art to achieve the reissue patent's result would have been obvious to the hypothetical person.

As has been shown in the previous sections, persons skilled in the art were able to fully embed anode cores, to make cores concentric, to fasten anodes and other bodies to pipes without external bands, to use a minimum number of arcuate segments, and to use interlocking rods between core bars and anodes. Mr. Doremus was not of the

---

**22.** Finding of Fact 33.

**23.** Conclusion of Law 48.

opinion that it would take unusual skill to change the prior art into the patented device.[24] He explained that it would be logical to remove the two circumferential bars of the Bulletin 191 anode into the body of the anode and embed them within the anode material, and that the use of the interlinking rods was a "logical extension" of the core rods of the Bulletin 191 anode. When Mr. Andrews was asked to make an anode fit upon a circular body, he simply bent a flat anode into an arc. Cathodic's own bulletin[25] points out that the various anodes they sell may be used in many ways, including cathodic protection of ship hulls, offshore structures and pipelines, thus showing the interchangeability of the technology and the level of skill in the art.

## VII

### Secondary Considerations

■ Finally, Cathodic urges that secondary considerations like commercial success, long felt but unsolved needs, and the failure of others to invent such an anode should be utilized as indicia of nonobviousness. The district court found that these considerations reinforced its determination of nonobviousness.[26]

Despite Cathodic's contention and the district court's finding, the secondary considerations do not lend patentability to this anode. Although the district court's true error was its determination of nonobviousness

and not its use of such secondary considerations,[27] the following words of Mr. Justice Brennan are pertinent:

> Though doubtless a matter of great convenience, producing a desired result in a cheaper and faster way, and enjoying commercial success, [the invention] "did not produce a 'new or different function' . . . within the test of validity of combination patents." *Anderson's-Black Rock v. Pavement Co., supra*, 396 U.S., at 60, 90 S.Ct., at 308, 24 L.Ed.2d, at 261. *These desirable benefits "without invention will not make patentability." Great A & P Tea Co. v. Supermarket Corp.*, 340 U.S., at 153, 71 S.Ct., at 130, 95 L.Ed., at 167.

*Sakraida v. Ag Pro., Inc., supra*, 425 U.S. at 282–283, 96 S.Ct. at 1537–38 (emphasis added). Because we hold that the claims made here are clearly obvious, we need not examine the secondary considerations. *See Roanwell Corp. v. Plantronics, Inc.*, 429 U.S. 1079, 97 S.Ct. 826, 50 L.Ed.2d 800 (1977) (White, J. joined by Brennan, J., dissenting from denial of certiorari)[28] (quoting *Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.*, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944) ).

## VIII

### Conclusion

Cathodic's reissue patent is invalid. The district court's contrary holding and its

---

**24.** The following testimony given by Mr. Doremus reflects this impression:

A . . . . We adapted a flat anode with a longitudinal core, to make bracelets. . .

Q So there is one instance where you did look to your previous knowledge of anodes which are useful for other purposes and adapt them to a different application, is that right?
A Yes.

**25.** Cathodic distributed a bulletin entitled, *"AZCO Zinc Anodes."* The bulletin describes a variety of different anode configurations some of which disclose entirely embedded cores with ends protruding from either end of the anode material. The bulletin also sets out the uses for which the described anodes are designed.

**26.** Finding of Fact 49.

**27.** The district court's findings of fact and conclusions of law indicate that the court used these secondary considerations only to bolster its conclusion of nonobviousness.

**28.** In *Roanwell*, the Supreme Court considered certiorari in a second circuit case, *Plantronics, Inc. v. Roanwell Corp.*, 403 F.Supp. 138 (S.D.N.Y.1975), aff'd, 535 F.2d 1397 (2nd Cir. 1976) (per curiam). The panel decision in that case is not inconsistent with the above analysis. The court said, "In view of the ample evidence of obviousness, plaintiff's arguments concerning secondary factors are not persuasive." 535 F.2d at 1398. It was the district court opinion, which relied on secondary considerations, with which Justices White and Brennan took issue in their dissent from denial of certiorari.

finding of infringement by appellants necessitates our reversal of its judgment for further proceedings in conformity with this opinion.

REVERSED AND REMANDED.

*Appendix 1*

35. The patent to Mills, No. 1,664,800, issued April 3, 1928, discloses *semi-cylindrical anodes for a pipeline* to be buried below ground. . . .

The patent to Mills *does disclose use of arcuate anode* segments for installation onto the pipe. However, the patent is not designed for use in submerged pipelines, does not require use of core to promote even distribution of current on the pipeline and even consumption of the anodic metal, is vague in its description of the core and does not disclose any particular means by which to secure the anode to the pipeline.

36. The patent to Godfrey, No. 2,067,839, issued January 12, 1937, discloses a cylindrical boat propeller shaft anode. . .

The patent to Godfrey does disclose an anode comprised of *two semi-circular sections.* . . . Further, the Godfrey patent provides for the use of *non-metallic cores which are not completely embedded in the anode.* . . . Finally, the type of mechanical connections required by the Godfrey patent would be inappropriate in a pipeline application. . . .

37. The patent to Wesley, No. 2,303,778, issued December 1, 1942, discloses a soil pipe of composite ferrous layers designed to prevent corrosion. . . .

The patent to Wesley does disclose a means of combatting underground corrosion electrochemically. . . . However, the patent does not disclose a bracelet but rather an envelopment of whole sections of pipe with layers of anodic materials.

38. The patent to Harris, No. 2,619,455, issued November 25, 1952, discloses a galvanic anode with a *wire core, being separated into segments held together by the core,* for use in protecting iron tanks. . . . The seminal feature of the patent is its rod-like anode with a flexible metallic core embedded lengthwise in the body of the anode.

The patent to Harris does disclose a *coaxial wire core completely embedded in the anodic material.* However, the anode has longitudinally spaced-apart notches to be broken into segments to permit formation of a polygon and is not designed to combat the problems of scale and durability which bracelet anodes must overcome. The segments are not arcuate, and the patent does not disclose any rods which cross-link core bars.

39. The patent to Osterheld, No. 2,656,314, issued October 20, 1953, discloses a means of combatting corrosion in hot water storage tanks. . . .

The patent to Osterheld *does disclose a connection from the anodic to the cathodic metal* . . . . However, credible evidence at trial demonstrated that the Osterheld patent bears only small relationship to the reissue patent, especially with regard to the scale of the former anode and its lack of reference to a bracelet application.

40. The patent to Sabins, N. 2,826,543, issued January 31, 1955, discloses a sacrificial magnesium anode with insulation to prevent premature disintegration of the anode by localized galvanic action. The patent features *laterally spaced, longitudinally extending core rods connected by cross-linking rods in the core structure,* making use of magnesium as the preferred anodic material.

The patent does disclose an anode with *internal core that is intended for marine use.* However, such use would be limited to so-called hull structures, because of the absence of arcuate design. The patent is not relevant to a bracelet anode application for a pipeline.

41. The patent to Douglas, No. 2,882,-213, issued on April 14, 1959, discloses a galvanic anode designed for marine use. . . .

The patent does disclose an anode with *embedded core material and longitudinal edges with ends projecting from either side.* However, the patent is rectangularly shaped with no arcuate design and is intended to be used principally as a hull anode. Moreover, the patent utilizes a laminated covering around the anode for insulation purposes which differs from the type of coating required for the reissue patent. No concentric core structure is shown.

42. The patent to Battis, No. 3,001,924, issued September 26, 1961, discloses a galvanic anode comprised of magnesium to which an electrical conductor is connected. . . . *The patent discloses a plug of metal, cathodic to magnesium (such as zinc or aluminum) but anodic to the ferrous metal conductor which protrudes from either end of the anode.*

*The Battis patent does disclose an embedded conductor with external straps extending from the sides of the anode.* However, the anode is rectangular, lacks an arcuate design and is useful primarily as a ship hull anode. The patent also does not disclose usage of internalized core rods pertinent to the instant application and requires usage of two sets of anodic material within the core.

43. The patent to Fairchild, No. 3,197,-262, issued on July 27, 1965, discloses a pipe protector adapted for use with drill pipe section. . . .

The patent discloses placement of a bracelet around a drill pipe but has no relation to cathodic protection and does not contemplate potential problems of design and placement of bracelet anodes on offshore pipelines. Further, the pertinent core design is not discussed.

44. The patent to Pennington, No. 3,240,512, issued on March 15, 1966, discloses

a conduit construction and weight means for underwater pipelines. . . .

The patent does disclose a sleeve for underwater pipelines *having two or more arcuate segments, each segment comprising a continuous arcuate body of concrete, with a metal core concentrically embedded entirely within the concrete adjacent to the inner periphery of the body.* However, the specific core design is not disclosed in the patent, nor are straps or other materials used to facilitate a welded or brazed connection to the pipe. Further, the metal base fits snugly on and directly against the pipe, contrary to the teaching of the reissue.

45. The military specification (MIL–A18001–H) cited by defendants (Defts.' Exhibit 12) discloses ship hull anodes *with straps extending from either end of the anodic body.* The design does not disclose completely embedded concentric cores and bears the same difficulty of adjustment to bracelet pipeline use as do the previously referenced patented hull anodes.

. . . . *The LL–26 anode's core consisted of a bar of steel with end portions projecting from the opposite longitudinal ends of the anode body.* These end portions were welded to the external conical wall surface of the fairwater cone. . . .

*The LL–26 anode does disclose concentrically extending cores embedded within the anodic body.* . . .

The LL–26 anode is a flat anode *which was bent to fit onto a cone.* . . .
[Emphasis supplied.]

### Appendix 2

Generally, Mr. Doremus testified that it was "as logical as anything you could come up with," to place the external straps of the Bulletin 191 anode inside the core and leave the internal core structure of the Bulletin 191 anode the same.

Q . . . . . "The same thing applies to the rods 16, which cross link between the strap cores, 14. They are

sort of a logical extension of the fact that you had longitudinal rod cores in the Bulletin 191 anode with an external circumferential band so that when we moved the bands internally, embedded them in the bracelet, the thought was naturally to leave what was originally a core in the segment, leave it where it was." That's what you testified to?

A Yes, it is. And it's as logical as anything you could come up with.

As Mr. Doremus testified, however, this was not the use of inventive faculties, but was in fact very old in the art.

Q Now, embedded cores were, of course, very, very old, were they not?

A Oh, yes.

Q And this [entirely embedding the core and making it adjacent to the inner periphery] has been common practice for many, many years, also, has it not?

A Yes.

With respect to the Godfrey patent, Mr. Doremus testified as follows:

Q And the Godfrey patent shows two semi-cylindrical segments, isn't that right?

A It does.

Q And if you could get a pipeline that is one inch in diameter, it would be adaptable to embrace such a pipeline, wouldn't it?

A It could. It wouldn't be a good bracelet anode for a pipeline, but if you wanted to put it around your pipeline, Mr. Conley, you could.

Q And the segments consist of a continuous arcuate body of a galvanic anode metal, isn't that right?

A That's correct.

Q And it has a metal core cathodic to the anode metal concentrically embedded within the anode metal adjacent to the inner periphery, is that right?

A It does disclose a metal core.

Q Those ends of the core are used to connect it together, aren't they? Connect the two halves?

A Yes, they are.

Q And they are also used as the conductor for electrical current between the anodic material and the shaft, in this case, or pipe, if it were on a pipe?

A When the core is metallic it serves as a conductor.

Mr. Werlin testified about specific patents in the following manner:

Q Let me just ask you quickly, do you agree that what is shown in Figure 8 [Mills Patent] is a semi-cylindrical zinc anode?

A Yes, it appears to be.

Q Now, semi-cylindrical zinc anodes are relevant to the subject matter that is to be patented, isn't that right?

A Yes.

Q Would you look at the next patent, the patent of Douglas in there? That's another one of the patents that were sent to you, I believe, by Mr. Cockfield, is that right?

A Yes.

Q Before the patent application was filed?

A Yes.

Q Does that patent disclose an anode which has two parallel core bars in it?

A Yes.

Q And the ends of those bars protrude from the opposite edges?

A Correct.

Q And those bars are used to fasten it to the object that this anode is to protect?

A Yes, sir, I think so. I haven't read this patent, but I'm sure that's right.

Q And the core bars are adjacent to one face of the anode, isn't that correct?

A Yes.

Q Now, your claim, if you will look at the patent in suit, the first patent in the book of patents there, your Claim 1 says that the metal core—that's sub-paragraph 2—is cathodic to the anode metal, and that's true of the metal core in the Douglas patent, isn't it?

A I assume so. As I say, I haven't read the patent. It would appear that's right.

Q And it's imbedded entirely within the anode metal, is that correct?

A Yes.

Q And the core comprises two axially spaced parallel metal bars, is that correct?

A Yes.

Q And the bars have end portions which project from opposite longitudinal edges of the anode body, is that correct?

A Yes.

Q And they form joint elements for connecting this anode to whatever it is going to protect, is that right?

A I believe that's correct. As I say, I haven't read it, but it would be logical.

Q It would be, then—you would agree that that's relevant to the subject matter, to the patentability of the subject matter of your patent, is that right?

A Yes, I would assume any—almost any anode would be.

Q The Battis patent, B-a-t-t-i-s, which is the next patent in the book there, 3,001,924, it's similar in structure to the Douglas patent, isn't it?

A Yes. Yes, I think so. Looking at the drawing, I would say so.

Q And your answers with respect to the Battis patent, if I were to ask the same series of questions that I did

about the Douglas patent, would be essentially the same, isn't that correct?

A Yes.

Q Now, the next patent in the book there, 3,240,512, is a patent of Pennington, et al., which I will clarify, for the Court, it is not Dr. Pennington, who is my expert witness here.

. . . . .

Q That is another patent that was sent to you by Mr. Cockfield before your patent application was filed, is that correct?

A Yes.

Q That patent shows two semi-cylindrical members of concrete, isn't that correct?

A It appears to be.

Q And they have a metal core in them, too, don't they?

A Yes, there is a metal liner.

. . . . .

Q And that's generally the same manner as the cores in your patented anode are welded together at their adjacent edges, isn't that correct? Adjacent halves, the two semi-circular halves.

A Yes. Each has a metal element that's welded together. . . .

. . . . .

Q Now, look at the next two patents in the book there, with the white tabs on them, the patents for Wesley, No. 2,303,778, and 2,656,314, Osterheld, O-s-t-e-r-h-e-l-d. Do you recognize those as the patents that the patent office cited in the first office action on your application?

A . . . .

Yes, those cited by the patent office.

Q What do they show that is relevant to the patentability of the subject matter of the patent in suit?

A  Well, I'm, frankly, going to have to guess at it, it shows something about more noble and less noble metals.

Q  Now, what do those disclose that is relevant to the patentability of the subject matter of the application you filed?

A  I looked those over, and looked at the action of the patent office, and those were referred to only in connection with Claim 6, I believe it was, which had to do with the shape of the ends of the metal straps, one being offset with respect to the other, so that they could be more easily coupled. And that's the only reference that these patents seemed to have to the application as filed. And, so far as I can tell, they had very little relevance to what we were concerned with.

Q  Let's go to the next patent in the patent book that you have there, the patent to Harris . . . .

A  . . . . It says "galvanic anode," and it shows a bar of what I presume to be galvanic material with a rod through it. . . .

Q  If you look at Column 3, Line 26 of the patent, the language there says, "An anode which possesses the foregoing features is illustrated in the accompanying drawings where the rod-like anode body 1 is of circular cross section."

Did I read that correctly?

A  That's right.

Q  The next sentence after that says, "Concentrically embedded in the anode and extending beyond the ends thereof is wire 2," . . . . .

A  Yes. . . .

Q  . . . . Let's go down further in Column 3, to Line 49, and the sentence there says, "In cross section the anodes may be round or polygonal," . . . . .

A  Yes.

Q  . . . . Now, you will look at Figure 4, and you will see in that figure the anode has been bent into a semi-circle, has it not?

A  Yes, sir. . . .

Q  But, as least so far, what we have is an anode body, and we have a generally semi-cylindrical segment, don't we?

A  Yes, but you have what appear to be either polygonal or cylindrical.

Q  . . . . We have already, concentrically embedded in there we have a core, don't we? This wire comprises a core in this structure, doesn't it?

A  It can be called that, certainly.

Q  And if we go to the top of Column 4, Line 11, it says, "The embedded wires or similar members serve both to mechanically connect the separated segments and as electrical conductors from the anodes to the tank or or [sic] metal body being protected." That's the same way that the core structure in the patented anode is used, isn't it?

A  Yes.

Q  And if we go further down Column 4, it says, "It is preferable that the wire be concentrically positioned in the anode, but this is not essential—" . . . .

. . . is that correct?

A  I'm sure it could be put any place in those rods.

Q  The patent says so?

A  Yes.

Q  And then down to Line 44 in Column 4, it says, "In some cases it may be desirable to employ two or more core

members, providing they are in the same plane," and you have two or more core members in the patent, you have got two parallel bars, right, in the patented anode?

A Yes, sir.

Q Let's go to the patent to Sabins, No. 2,826,543.

Q That patent is also about anodes for cathodic protection, isn't it?

A Yes.

Q And it says that the core includes a pair of laterally spaced longitudinally extending core rods, and it says they are interconnected by transverse, or weldably connected, actually, together by a plurality of transverse members or spur rods. Is that correct?

A Yes.

Q Okay, let's look at the last patent in the book, the patent of Godfrey, No. 2,067,839. . . .

Q As you can see, by looking at the drawing, particularly Figure 3 of the drawing, what the patent discloses is a cylindrical member which is composed of two semi-cylindrical segments which are held together by a couple of bolts, is that right?

A That appears to be correct, yes.

Q The core in there is concentric with the outer zinc portion, isn't that correct?

A Yes.

Dr. Pennington testified as follows:

Q Now, from your study of the prior art that you have seen, which you heard Mr. Gordon Doremus testify that he knew about before the original application was filed and before the original patent was issued, do you find those elements that you have just talked about within any of that prior art?

A Yes, I heard him testify about the Mills patent, that's Mills 800, and it does have the semi-cylindrical form of a body, or a galvanic anode. He also testified about a ball-shaped anode, which consisted of two semi-circle halves, which I believe was to be put on to things such as boat shafts. So in both of these cases, there was art of which they were aware, which did show semi-cylindrical bodies.

Q All right, sir, how about the next one, the core embedded entirely within the anode and adjacent the periphery?

A That appears in, for instance, these hull anodes, at least one of which is on the table and is an exhibit.

Q This one here, Exhibit 53?

A Plaintiff's Exhibit 53. The cores there, or core, is entirely embedded in the anode material, and is adjacent to the inner—to one side. Also, some of the patents that they have at that time show the same sort of thing. I'm thinking particularly of the Battis patent and the Douglas patent, both of which have cores completely, or entirely, embedded in the body, and adjacent one side.

Q How about this one at the bottom here. opposite longitudinal edges, where the end portions of the core bars project from the opposite longitudinal edges of the anode body?

A Those are found in the art that I just mentioned, namely, in the hull anode and in patents such as Battis and Douglas.

Q In the prosecution of this application for reissue, what was emphasized as the principal distinction over the prior art?

A The thing that is mentioned over and over again is having a core completely embedded in the anodic material.

Q And what do you find in the prior art with respect to the complete embedding of cores in the anodic material?

A That was, really, the general practice. This is the way it's done.

Q Can you give us just a couple of examples, please?

A I mentioned the hull anode as an example, Mills has it, Battis has it, and the patent to Godfrey has it, except that there is an inside part of it that goes against the shaft and is not embedded. The Mills spec, and by the Mills spec I mean that exhibit we have of a military specification showing hull anodes and other kinds, it has it. In fact, all the way through, page after page, you see anodes in which the cores are completely embedded in the anodic material.

Q All right. Can you tell us whether there are any features described— let's take Claim 1 of the original patent, for example—which are not disclosed in the Godfrey patent?

A The thing I mentioned about the completely embedded—one could take the position that this core in Godfrey is completely embedded. However, it could be argued that it is not, because there is a face of it which depends for its coverage on the item to which it is to be attached. However, in effect it is completely embedded.

The reading of the claim we have, "a pair of semi-cylindrical segments adapted to embrace a—" it could be a pipe, it could be anything round, "each segment comprising a continuous semi-cylindrical body of galvanic anodic metal," we have that, definitely. "A metal core cathodic to the anode," and this metal core is made of steel, or can be made of bronze, it depends on what you are going to protect with it. However, it is "cathodic to the anode," which is made of zinc, magnesium or aluminum," entirely within, adjacent the inner periphery of said body." Well, certainly it is adjacent to the inner periphery of said body, just as one piece of property is adjacent to another. "Said core comprising at least two axially spaced parallel metal bars," which I read on Element 21, in Figure 5 and Figure 6, "A plurality of angularly spaced metal rods interlinking said bars." We do not have that, in those words. It's interlinked, but it's not in the form of the three bars.

Q It's a single sleeve?

A It's a single sleeve. "—each of said bars having end portions projecting from opposite longitudinal edges of the anode body to form joint elements." It could be argued that here we do not have them extending out, but we do have the equivalent in the form of a joint member. In this case it's a cap screw into a hole in one member and a threaded hole in the other member, one on each side.

Q Dr. Pennington, in plaintiff's testimony, you heard, or I believe you heard that they—Mr. Doremus, particularly, testified that in his opinion a segmented, a quarter section, quarter circle, or an eighth circle was, in effect, the same thing as a semi-cylindrical member, is that right? Do you recall that testimony?

A I recall that testimony, yes.

Q All right. If you were to assume that a continuous semi-cylindrical body of anodic metal and a continuous quarter circle or eighth circle of galvanic anode metal are all the same, what effect would that have on this claim?

A Well, the effect it would have on that claim would be to wipe out that word semi-cylindrical in Line 45.

Q This line here?

A That line there.

Q They also testified that it didn't make any difference whether you had two core bars or one core bar, it was the equivalent. What would be the effect of that on this claim?

A Well, the effect of that would be to wipe out some material there in, first of all in 3, sub-A, we would have a metal bar, instead of—

Q A metal bar?

A A metal bar.

Q So we'll mark off the two right here and leave "a," and mark the "s" out of bars. No, I went too far, I shouldn't have marked out "metal."

A That's right, I'm sorry, I misled you on that.

Q Now, they also testified it didn't make any difference whether you had angularly spaced metal rods?

A Yes, but before we get to that, I have one more thing to say in connection with the last question.

In 3–C, the words "each of" would no longer be pertinent, and take the "s" off the end of the "bar." We would have "said bar having—"

Excuse me, Counselor.

Q That's all right. Thank you for that correction.

They also said that it didn't make any difference whether you had the interlinking angular spaced metal rods interlinking the bars, it would still be an infringement without that, didn't they?

A Yes, I heard that testimony.

Q Now, what effect does that have on the claim?

A That wipes out 3–B, completely.

Q And they went further and said that if it comes out of the sides, if the bars come out the sides, it, in effect, is the same thing as coming out of the opposite longitudinal edges, isn't that right?

A That's right.

Q What effect does that have on this claim?

A That would affect—in 3–C we have, "projecting from." Now, it would strike out "longitudinal edges of."

Q "Opposite longitudinal edges of"?

A Yes. So that the 3–C would now read, "said bar having end portions projecting from the anode body," et cetera.

Q If that claim has been modified by the plaintiff in order to read it on the designs that are accused of infringing, what are the differences between that claim and the claim that was originally filed in the first application?

A It's very similar, inasmuch as the original claim, No. 1 was combined with No. 5, which gave the core structure. Now, we have kind of played havoc with this Claim 5 part, namely, the core structure, which leaves us primarily with what—just what was in rejected Claim 1 of the original application, and which was passed up, they gave that up.

Q This claim now, as in this form, would you say that the prior art discloses anything of the nature as defined by this claim as the plaintiff would have us read it?

A Oh, yes.

Q What?

A Well, from the standpoint of patents, you can read that claim now on Harris—

Q The Harris patent? Would you point out the Harris patent to us and show us how that is effective?

A The Harris patent is one of the blue labeled patents in the book, which is Defendants' Exhibit—

Q 32, Defendants' Exhibit 32.

A Thank you. It's the first of the blue-labeled patents, and is Harris, et al, 2,619,455. This was issued in 1952, to a man, or men, who assigned it to Alcoa, Aluminum Company of America. This shows, first of all, a semi-cylindrical—in Figure 4—a semi-cylindrical, or semi-circular aggregation of segments which have a core running concentrically. This core, it says in

the teaching of the patent, can be two rods instead of the one that is shown, if it is desired. This core is completely embedded within the anodic material, except, of course, like all of these, a little bit for connection purposes sticking out the end. And this core that runs concentrically about the—what would be a pipe, if it were put on a pipe, is shown in Figures 2 and 3 to be in the center, but the text of the patent shows that it can be moved to a side.

So you can read this emasculated Claim 1 right on Harris with very little resort to any equivalents of any kind.

Q In other words, you don't even have to have any other prior art or reference at all?

A No, I think Harris has it. But there is other art that comes close to it, and most of it has been touched on a number of times.

Q How about the one shown in Plaintiff's Exhibit 31 that you just looked at a minute ago, the Southern Shipbuilding design?

A It has everything except "totally embracing." I don't want to digress a lot, but as to the meaning of this claim, the claims say "embrace." The text of the specification, when it is talking about the embodiment shown, and so forth, talks about "completely embraced." So that, in a sentence, then, the claims are broader, when they say "embrace," are broader than "completely embracing."

That is to say, "embrace" would include "completely embracing," a picture of which is shown, and would include "partially embracing." It's a broad term.

Now, the reason for that digression is that Southern Shipbuilding, you have two quarter-circle anodes with concentric cores, the concentric cores are near the inside edge. You do not have four. So that the anodic materi-

al does not go all around a complete 360 degrees, it goes 90 degrees, 90 degrees, and then it joins, however, as it has to be, on the other two 90-degree segments. But it does have—anything that could be thought of as an invention here is in that Southern Shipbuilding.

Q Are the Southern Shipbuilding anodes any more or any less adapted to embrace a pipeline than the quarter-circle anodes like Plaintiff's Exhibit 52, and the eighth-circle, like Defendants' Exhibit 34, which are accused of infringement?

A They are equally adapted to embrace. That is to say, the Southern Shipbuilding anodes are adapted to embrace, as shown in the exhibit that I drew up, which was DX–12, was it?

Q You are talking about 17?

A DX–17. So that the anode that was furnished to Southern Shipbuilding years ago, is adapted to do the very job we are talking about through this whole action.

Q That's what the claim says, isn't it, "adapted to embrace a pipeline"?

A Yes. The infringement here is in having these pieces. We do not have them here assembled exactly, because these pieces are adapted. That is, they are not assembled on a pipeline, they are not pigtails to the pipe. The patent does not go to coating whatever bare metal there is, or any of these things. It goes to these pieces and how they can be put together to make a bracelet.

Q In your opinion, if the patent office examiner had had before him the prior art that we have discussed here today, what should his action have been?

MR. BRESTON: Your Honor, I object to this question it calls for a conclusion, speculating on the part of the witness as to what the examiner might have done.

THE COURT: I think, in view of his familiarity, I will hear it, Mr. Breston. It will be given proper weight.

A    And my testimony will be in direct answer to the question, what he should have done, not what I think he would have done, which, of course, would require mind reading.

He should have rejected it, in view of this art that we have before us in this courtroom.