### HUGHES TOOL COMPANY
### v.
### INGERSOLL–RAND COMPANY.
#### Civ. A. No. 68–H–624.

United States District Court
S. D. Texas,
Houston Division.
Aug. 13, 1969.

Andrews, Kurth, Campbell & Jones, Paul Harris, Houston, Tex., for plaintiff.

Fulbright, Crooker, Freeman, Bates & Jaworski, Dudley R. Dobie, Jr., and Jefferson D. Giller, Houston, Tex., and Sandoe, Hopgood & Calimafde, J. M. Calimafde, New York City, for defendant.

MEMORANDUM:

CONNALLY, Chief Judge.

### FINDINGS OF FACT

Plaintiff Hughes Tool Company is a Delaware corporation having a principal place of business in Houston, Texas. Defendant Ingersoll-Rand Company is a New Jersey corporation having a place of business in Houston, Texas. The patent in suit, No. 3,185,228, was filed on January 21, 1963, and was issued May 25, 1965, to J. L. Kelly, Jr., a Hughes' employee. The patent was assigned to Hughes and is owned by Hughes. Only Claims 3 and 7 have been asserted by plaintiff.

As is usual in controversies of this nature, the plaintiff sues for infringement; and the defendant attacks the validity of the patent.

The patent in suit covers a percussion-rotary type drill bit. This type of bit is used primarily for drilling shallow holes such as for the quarrying of rock or minerals, or for the drilling of water wells. In operation, this type bit is struck a series of hard and rapid blows by a hydraulic hammer (approximately 1,000 blows per minute) and at the same time is rotated rather slowly (about 20 revolutions per minute).

Defendant Ingersoll-Rand has been a leader in the manufacture and sale of percussion-rotary type bits for many years. The bit which it most commonly used, and which still enjoys wide popularity is referred to as the "crosshead" or "X" bit. This bit has chisels imbedded in the face of the bit in the form of an X. These chisel inserts are of tungsten carbide, a very hard metal. The chisels extend laterally slightly beyond the body of the bit, so that a hole is cut slightly larger than the body of the bit. Of course, this is necessary to prevent the bit from becoming stuck or wedged in the hole.

Hughes Tool Company for many years has been a leader in the manufacture and sale of bits for drilling in the oil and gas industry, but only recently entered the field of percussion-rotary bits of this nature. After securing the patent in question, Hughes manufactured and sold the so-called "button bit" essentially as exemplified in the patent in suit. A button-type bit is one wherein the cutting elements mounted in the face of the bit (comparable to the chisels in the "X" bit) are essentially in the shape of half-spheres or buttons extending across the face. The face is circular in shape and the peripheral edge of the bit is chamfered to receive a heel row of buttons. It is alleged by Hughes that there is novelty in mounting the buttons in the heel row at an angle to the axis of the bit, so that the buttons extend below the bottom surface and beyond the peripheral surface. These buttons likewise are tungsten carbide inserts. The heel row buttons, extending slightly beyond the peripheral surface by reason of being imbedded in the chamfered edge, cut a hole of slightly larger gauge than the body of the bit, to prevent wedging.

The plaintiff claims many advantages for its button bit over the "X" bit, primarily (1) a much reduced need for repeated sharpening of the cutting elements, and (2) a reduced inclination to wedge in the hole. It is true that the chisels of the "X" bit become dulled, and the bit must be removed from the hole and the chisels sharpened. Of course, this is an expense not alone for the sharpening, but for the down-time of the drilling operation. The buttons require less frequent treatment of this nature. Further, it is alleged that the chisels of the "X" bit have a tendency to become worn to a great degree at the gauge of the hole, that is, at the periphery. This is so because the greater amount of the cutting work is done there, rather than toward the center of the hole. It is urged that the chisels become more worn

on the corners after much use; that after this wear the bit fails to cut the larger hole; and that the bit becomes wedged.

The button bit of the type produced by the plaintiff Hughes has met with considerable market success. While the "X" bit still outsells the button bit by a very wide margin, the evidence shows, and I find, that in certain types of rock formation the button bit is superior. In a great many other types of drilling, the "X" bit still seems to be much preferred.

After the button bit was developed and sold by Hughes, the defendant Ingersoll-Rand offered a button bit on the market. It is quite similar in many respects. It is conceded by Ingersoll-Rand that its button bit infringes in all respects as to Claim 7. I am of the view that it likewise infringes as to Claim 3. As noted hereafter, however, I am likewise of the view that the patent is invalid and that it was completely anticipated by the prior art.

## THE PRIOR ART

Percussion bits were well known long prior to the filing date of the patent in suit. The shape of the bit body is conventional. The use of inserts of very hard material such as hardened steel, diamonds, and carbide implanted in the face of a drill bit also was well know long prior to the patent in suit.

The defendant cites and relies primarily on three patents as prior art. They are No. 2,579,268 to Malherbe; No. 3,071,201 to Phipps; and No. 2,725,-216 to Brown.

Malherbe discloses a percussion bit utilizing carbide inserts in the form of small chisels wherein the heel row of inserts is oriented at an angle to the axis and extends below the bottom surface and beyond the peripheral surface of the bit body. This patent effectively anticipates the patent in suit.

The most pertinent reference, however, is No. 2,725,216 to Brown. This patent discloses a rotary percussion bit with a heel row of buttons angularly disposed and extending below the bottom surface and beyond the peripheral surface. It is, in my judgment, distinguished from the patent in suit in only one material respect. In Brown, the buttons are of steel and are a part of the bit body. In the patent in suit, the substitution is made of replacing the steel buttons with tungsten carbide inserts. As noted above, the use of tungsten carbide, diamond, or other very hard material as inserts for doing the actual cutting is not new and has been known in this and other arts for years. The substitution, which is the only contribution which the patent in suit makes over Brown, in my judgment was perfectly obvious.

Plaintiff Hughes challenges the Brown reference for an added reason. It is contended that Brown teaches that the heel row of inserts actually reams the sidewall of the hole, as distinguished from the bottom; while Kelly teaches that reaming of the sidewall is a mistake, and leads to wedging. It is true that the Brown patent makes reference to the cutting of the sidewall. However, any difference between the operation of the two in this respect would depend upon the angle at which the heel row of buttons is set into the body of the bit. Kelly does not specify any particular angle for his heel row. He specifies only an acute angle. Similarly, in Brown it appears that the angle may vary. Brown uses as an illustration an angle of 45 degrees for the heel row inserts. Kelly states (column 7, line 20):

> "The particular angle of inclination of heel inserts used in the test bits described above varied from 30–38 degrees from vertical but this angle will also vary with the type formation drilled."

If, in fact, the heel rows on Brown would cut the sidewall above the corner formed by the bottom of the hole and the sidewall, and if Kelly cuts at the corner this is a distinction without a difference. The differential distance between the two is so small as to be insignificant. In fact, Figure 7 of Kelly showing as an

alternative a concave bottom of the bit would have the heel row cuts further from the bottom than is shown by Brown.

While I do not consider that it rises to the dignity of file wrapper estoppel as defendant contends, it is interesting to note that in the presentation of the matter to the Patent Office counsel in support of the Kelly patent states that as to all of the bits shown by Brown, "There is nothing to prevent the outer surface of each bit from wearing most rapidly at the intersection of the bottom and side surface." Thus I consider this difference, if there be one, was not considered of significance at the time of presentation, and I do not consider it significant now.

One feature which every bit of this character must possess if it is to work at all is means for removal of the cuttings from the bottom of the hole. This is almost always accomplished (as it is here) by courses through the body of the bit whereby either compressed air, water, or other drilling fluid is injected into the bottom of the hole. There the air picks up the cuttings and removes them through a plurality of longitudinal slots along the peripheral surface of the bit body. When the cuttings are thus removed in a stream of air or water, the face of the bottom of the bit is eroded by the friction of the cuttings against such bit face.

Claim 3 of the patent in suit incorporates by reference the subject matter of Claim 1, and states further that the peripheral surface of the bit body has a plurality of longitudinal slots to promote wearing of the surface at least "as fast as" the rate of wear of the heel row of buttons. By this is meant that it was the inventor's intention that the abrasive action of the cuttings removed by the air stream would cut away the face of the bit at least as fast as the rate of wear of the buttons. Thus, hopefully, the length by which the buttons protruded below the face of the bit would remain approximately the same. This claim is vague, indefinite and uncertain. The expression "at least as fast" implies a rate of wear of the peripheral surface which is faster than that of the button inserts. This would be undesirable, as a greater accelerated rate of wear of the peripheral surface would simply erode away the supporting metal for the inserts, as result of which they would fall out. Additionally, the patent specification does not teach how to control this rate of wear. The rate of wear would depend upon many variables, such as the velocity of the air carrying the cuttings, the location and number of exhaust holes, the hardness of the rock formation of which the cuttings formed a part, the hardness of the steel, etc. This claim, and the illustrations in the patent of the longitudinal slots, make no contribution and are inconsistent and misleading.

Claim 7 asserted by plaintiff is essentially the same as Claim 1, except that it calls for the edge of the bit to be chamfered. Chamfering of an edge to facilitate drilling holes is unpatentable. It is merely a manufacturing expedient and has been well known and frequently used for similar applications in a great many instances. Alternating, or spaced chamfering, to permit the heel row buttons to be seated at an angle is shown by Brown.

I recognize that one of the references cited by the Examiner of the Patent Office was Brown 2,725,216, and I recognize the strong presumption in favor of validity resulting from this circumstance. I am convinced, however, that Brown completely anticipates the patent in question, save in the rather insignificant particulars mentioned and discussed above.

The claims are invalid under 35 U.S. C.A. § 102 as being fully anticipated by the patents of Malherbe and Brown. The claims likewise are invalid under 35 U.S.C.A. § 103 as representing nothing more than obvious differences over the prior art.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the parties and the subject matter.

The claims involved are invalid under 35 U.S.C.A. §§ 102 and 103.

The action is dismissed at plaintiff's cost.