**REED TOOL COMPANY, Plaintiff,**

v.

**DRESSER INDUSTRIES, INC.,
Defendant.**

**REED TOOL COMPANY, Plaintiff,**

v.

**SMITH INTERNATIONAL
INC., Defendant.**

**Civ. A. Nos. 76–H–1703, 76–H–1968.**

United States District Court,
S. D. Texas,
Houston Division.

Sept. 25, 1980.

A. H. Evans, Vinson, Elkins, Searls, Connally & Smith, Houston, Tex., for plaintiff Reed Tool Co.

Floyd R. Nation, Arnold, White & Durkee, Houston, Tex., for defendant Dresser Industries, Inc.

Andrew J. Belansky, Christie, Parker & Hale, Pasadena, Cal., for defendant Smith Intern., Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McDONALD, District Judge.

This case was tried before the Court from December 3, 1979, through December 19, 1979. Extensive post–trial briefs and memoranda were filed and oral argument was heard on March 3, 1980. Additional memoranda were submitted after oral argument. The Court has now had a full opportunity to review the facts, the law, and the arguments of the parties. In accordance with Fed.R.Civ.P. 52, the Court hereby enters the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

### A. *NATURE OF THE ACTION*

1. This is an action for infringement of United States Patent No. 3,495,668, a patent which relates to a three–cone rotary rock bit used to drill oil and gas wells. It was originally brought as two separate cases. The first was filed by plaintiff Reed Tool Company against defendant Dresser Industries, Inc., on October 18, 1976. The second was filed by plaintiff Reed Tool Company against defendant Smith International, Inc., on December 1, 1976. The two cases were consolidated by order of the Court on November 7, 1978.

2. The defendants deny infringement and have set forth defenses asserting invalidity and unenforceability of the patent both on statutory grounds and on the grounds of laches and estoppel. Defendant Dresser Industries, Inc., also seeks a declaratory judgment by way of counterclaim that the patent is invalid, unenforceable, and not infringed.

### B. *THE PARTIES*

3. Plaintiff Reed Tool Company (hereinafter referred to as Reed) is a corporation of the State of Texas, having its principal place of business in Houston, Texas. Reed is primarily engaged in the business of manufacturing and selling rotary drilling equipment, including rotary rock drill bits.

4. Defendant Dresser Industries, Inc. (hereinafter referred to as Dresser), is a corporation of the State of Delaware, having a regular and established place of business in the Southern District of Texas. Defendant Smith International, Inc. (hereinafter referred to as Smith), is a corporation of the State of California, having a regular established place of business in the Southern District of Texas. Defendant Dresser, through its Security Division, and Defendant Smith, through its Smith Tool Division, are also manufacturers and sellers of rotary rock drilling bits, and are principal competitors of Reed.

### C. *ROCK BITS AND THEIR USAGE*

5. Three–cone rotary rock bits have been used to drill oil and gas wells for over forty years. They consist of a head portion and three cone–shaped cutters. The top end of the head is threaded. The three cutters are mounted on legs protruding from the lower end of the head. Their apexes extend generally toward the center of the bit.

6. In order to drill a well, the threaded portion of the head of the bit is screwed into the lower end of a "drill string," an interconnected series of drill pipes. The drill string is then lowered into a borehole and rotated. Sufficient downward force is applied to the drill string to cause the cutters to drill through rock formations as they are rotated. In the meantime, a fluid medium, usually a thickened liquid, called "mud," but in some instances air, is pumped down through the center of the pipe to emerge at the drill bit, where it picks up the cuttings loosened at the bottom of the

hole and carries them off upwardly through the hole to the surface.

7. As would be expected, the cutting elements on all drill bits become worn with use, and when the rate of penetration of a drill bit decreases to an unsatisfactory level as a result of dullness of the cutting elements or any other malfunction of the bit, it is necessary to change the bit. To effect a change, the drilling crew must typically raise the entirety of the drill string, uncoupling it and stacking it at the drilling rig in sections, and attach a new drill bit to the bottom of the pipe. Then the entire string of drill pipe is recoupled and the bit is lowered to the bottom of the hole for renewed drilling.

## D. THE EVOLUTION OF ROTARY ROCK BIT DESIGN

8. For many years, the principal type of rotary rock bits used in the drilling industry were milled tooth bits. In these bits, the cutting structure consisted of rows of elongated steel teeth which were formed integrally with the cutter. In manufacture, a thick–walled cutter was forged from steel and the walls were then milled–portions of the surface of the cutter were removed–leaving the teeth–like projections extending from the cutter surface. The outer surface of the teeth and cutter were then carburized, or "case–hardened," to increase wear–resistance and strength.

9. Because hard and soft formations yield most easily to different drilling forces, the design of these milled tooth bits varied in accordance with the type of formation for which they were intended. Bits designed for hard formations had shorter, more closely–spaced teeth, as these produced the vertical crushing action to which the hard formations most easily responded. Bits intended for soft formations had much longer and wider–spread teeth, as these produced the gouging and scraping action which worked best in the soft formations. Bits designed for the soft formations also included much greater "skew" or "offset." "Skew" or "offset" is present in a bit when the axis of rotation of each of the three cone–shaped cutters do not intersect at the centerline, or axis of rotation, of the bit. All rotary rock bits include some offset, but the greater the offset, i. e., the larger the difference between the intersection of the axes of rotation of the three bits and the axis of rotation of the bit as a whole, the more vigorous the gouging and scraping action produced by the bit's rotation. Thus, bits designed for the hard formations include approximately $\frac{1}{32}$" to $\frac{1}{16}$" offset, an amount so small that the bits are referred to as "non–offset" bits. Bits designed for the soft formations include $\frac{1}{8}$" or greater skew and are referred to, not surprisingly, as "offset" bits.

10. Utilization of milled tooth bits over the years indicated that such bits were less than ideal for drilling hard formations. No matter how well–designed they were, milled tooth bits were limited by the strength of the metal with which they were constructed. In drilling the hard rock formations, the carburized steel of which the bits were constructed ground down very quickly. The teeth would simply wear away on the hard rock. In very hard rock formations, a milled tooth bit might drill for only a few feet, after which it would have to be pulled out of the hole and replaced. This was very expensive, not only in terms of the number of bits required for drilling a well, but also in terms of the time required for each "round trip" in which the drill string, often thousands of feet in length, would have to be removed from the hole and disconnected, joint by joint, so that the drill could be changed.

11. In the early 1950's this problem was substantially eliminated by the introduction of insert bits. These new bits used rounded or hemispherical elements of tungsten carbide to do the cutting. In contrast to the way milled tooth bits were manufactured, with portions of thick–walled cutters being machined away to create the cutter teeth, insert bits were manufactured by forging regular–walled cutters, boring sockets in them, and then placing tungsten carbide inserts into the sockets. The insert bits corresponded in design to the hard forma-

tion milled tooth bits in that the inserts were closely spaced and did not protrude far from the conical cutter. As tungsten carbide is much harder than carburized steel, however, they proved much more efficient and economical in drilling hard rock formations.

12. Although tungsten carbide inserts would have worn less quickly in medium and soft formations, insert bits were not, at first, used to drill in these formations. There were three reasons for this. First, unlike the carburized steel teeth in the milled tooth bits, the inserts in the insert bits were not an integral part of the cutter itself. Second, tungsten carbide, although stronger than carburized steel, is also more brittle than that metal. Thus, the inserts were more likely to break when subjected to the degree of offset utilized in drilling the soft and medium–density formations than were the milled teeth. Third, there was not as great a need for more wear–resistant teeth in soft and medium–density formation drilling. The milled tooth bits drilled these formations without much difficulty.

13. Even so, as time went on, the various characteristics which had been used to adapt milled tooth bits to softer formations were in turn incorporated into insert bits. Finally, in late 1967, the plaintiff introduced the Reed SCM bit. Designed to drill in medium–density formations, it was, according to counsel, the first commercially successful offset bit with extended inserts. It is the subject matter of the patent in suit.

### E. THE PATENT IN SUIT

14. On July 5, 1968, Percy W. Schumacher, who developed the Reed SCM bit, filed his application for the patent in suit. United States Patent No. 3,495,668, the patent in suit issued on February 17, 1970, to G.W. Murphy Industries, Inc., now Reed Tool Company by change of name, upon the assignment of the inventor. Reed Tool Company, the plaintiff in this action, is the owner of the entire right, title, and interest in and to the patent for its entire term.

15. As a result of the complaint and counterclaim, claims 1 through 6 of the patent in suit are at issue in this action. However the defendants have only been accused of infringing claims 4 through 6. Those claims read as follows:

4. A drill bit according to claim 1, wherein said cutting elements have a substantially conical shaped protrusion.

5. A drill bit according to claim 4, wherein the cone angle of said conical shaped protrusions is substantially in the range from 45 to 75 degrees.

6. A drill bit according to claim 4, wherein the outermost portion of each of said conical shaped protrusions is blunted.

16. Claim 1, upon which claims 4 through 6 depend, reads as follows:

1. A drill bit, comprising a head,

at least one roller cutter,

bearing means for rotatably mounting said roller cutter on said head,

the axis of rotation of said cutter extending inwardly and away from said head generally toward and skewed from the axis of rotation of said head,

said cutter having a plurality of hard metal cutting elements inserted therein, each of

said hard metal cutting elements in at least one row having a protrusion of at least one–half of its diameter, sufficient strength to minimize breakage and a minimum projected area both axially and circumferentially of said cutter.

17. As can be seen, the patent is directed to a rolling cutter, or rotary, rock bit which has three supposedly distinguishing characteristics: (1) the rolling cutters are offset, i. e., having their axis of rotation skewed away from or offset from the axis of rotation of the bit itself; (2) the bit uses cutters which have hard metal teeth inserted into sockets in the cutters; (3) the hard metal insert teeth extend outwardly from the surface of the cutter an amount at least one–half the diameter of the insert, and the

extended portions of those teeth present a "minimum projected area both axially and circumferentially" of the cutter and have "sufficient strength to minimize breakage."

■ 18. Each of these characteristics, the plaintiff concedes, *Plaintiff's Post–trial Brief*, at 28–30, was well known in the drill bit art prior to the time that Mr. Schumacher filed his application for the patent in suit. Mr. Schumacher claimed, in other words, a "combination" invention. That, of course, did not prevent the patent office from issuing the patent in suit, for, as the Fifth Circuit stated in *Williams Bit & Tool Co. v. Christenson Diamond Products Co.*, 399 F.2d 628, 632 (5th Cir. 1968):

> a combination is patentable, though each of its constituent elements was well known in the prior art, if the combination produces a new and useful result and would not have been obvious at the time of the invention to a person having ordinary skill in the art. 35 U.S.C. §§ 101, 102, 103.

## F. *VALIDITY*

19. The defendants in this action contend that the patent office erred in issuing the patent in suit. They allege that the patent is invalid for lack of novelty under 36 U.S.C. § 102, for obviousness under 35 U.S.C. § 103, and for lack of disclosure under 35 U.S.C. § 112. They acknowledge that a patent, once issued, is presumed to be valid and that it is their burden to prove invalidity. *See* 35 U.S.C. § 282. They point out, however, that:

> [t]his presumption is founded on the understanding that patent approval is a species of administrative determination supported by evidence. Consequently, in an infringement suit, when the defense of invalidity of the patent is raised on the ground that prior art was not submitted to the patent office, the foundation for the presumption vanishes, the presumption itself is severely weakened, and the court is required to scrutinize the patent more closely.

*Cathodic Protection Service v. American Smelting & Refining Co.*, 594 F.2d 499, 505

(5th Cir.), *cert. denied*, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979), and cases cited therein.

20. The Fifth Circuit has held "that when a challenge is made to the validity of a patent in an infringement suit, that issue should ordinarily be taken up first and infringement considered only if validity is decided favorably to the patentee." *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 558 n.4 (5th Cir.), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970). *See Overhead Door Corporation v. Newcourt, Inc.*, 611 F.2d 989 (5th Cir. 1980). The defendants have raised the question of validity. It will, therefore, be dealt with first.

### 1. Section 102–Lack of Novelty

21. The defendants base their claim of lack of novelty under § 102 on three items: (a) a Russian drill bits handbook, Exhibit P–7, (b) Smith's ER 1091 work, and (c) the Chicago Pneumatic EM–1VC bit. None of these items were reviewed by the patent office when it made its determination of patentability.

### (a) *The Russian Drill Bits Handbook*

22. The Russian drill bits handbook submitted into evidence by the defendants, Exhibit P–7, was published in 1965, "more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). *See* Finding of Fact 14.

23. Figure 132 of the handbook, found on page 168 and described on page 167, pictures a three–cone rotary rock bit with offset and tungsten carbide inserts. The inserts are described as "prismatic," *see* Exhibit P–7A, but there is no indication as to whether they, in the words of the patent in suit, have "a protrusion of at least one–half of [their] diameter."

24. The defendants seek to avoid this difficulty by arguing that the inserts in the bit pictured in Figure 132 must have been seated in the cutter in accordance with a "square ratio design rule" disclosed in U.S. Patent No. 3,444,870, Exhibit P–6. *See Defendants' Post–trial Brief*, at 22–25. There

is no evidence that indicates, however, whether the "square ratio design rule" is followed in Russian drill bit design. In fact, the evidence that has been introduced shows that the rule is not even uniformly followed in American drill bit design: Smith, for example, does not follow it. *See* Tr. at 2136. The Court cannot find that the bit pictured in Figure 132 of the Russian drill bits handbook was constructed in accordance with the "square ratio design rule." It cannot, therefore, hold that the bit pictured in Figure 132 deprives the patent in suit of novelty under § 102.

### (b) *Smith's ER 1091 work*

25. In 1966, Smith initiated a project under Engineering Requisition No. 1091 to test bits with approximately ⅛″ offset and tungsten carbide inserts similar in shape and extension to those now accused of infringement. The first planning discussions in regard to ER 1091 took place between Mr. Lloyd Garner, who initiated the project, and Mr. Herrick, who supervised it, in August, 1966. A first undated layout drawing in regard to the project was made in either August or September, 1966. The first dated document relating to the project, Insert Drawing No. 14069, is dated October 5, 1966. *See* Exhibit AA–4, at 13. Three bits incorporating the required offset and having inserts in accordance with Drawing Nos. 14069 and 14068 were built prior to May, 1967, and run in wells in Odessa, Texas, during that month.

26. Smith's actions in regard to ER 1091 preceded the corresponding actions of Reed in regard to BR–80, the project which led to the development of the patent in suit. The earliest dated drawing prepared in connection with BR–80 is an insert drawing dated December 6, 1966. *See* Exhibit 36F. The first bit made under BR–80 was not shipped to the field until May 29, 1967, and was not run in a well until on or about June 25, 1967.

27. When it ran its ER 1091 bits in Odessa, Smith deliberately misdesignated at least one of them as a milled tooth bit. This was done, Mr. Garner said, "to confuse the opposition." Tr. at 1967–1968. The

bits were accompanied to the well by Smith personnel and, as best can be determined, returned to Smith's engineering department for inspection after being run.

28. Smith made no charge for one of the bits. The charge for the other two was a reduced one, based on the amount of hole drilled by the bit, which was less than expected. Moreover, even though these charges were made and paid, the customers never received possession of the bits. The bits always remained under Smith's supervision and control.

29. The ER 1091 project was, for the most part, a failure. The field reports submitted by Smith personnel supervising the tests show that the bits failed early and were not economical when compared with milled tooth bits. The project was closed in February, 1969. Further testing of similar bits was postponed.

30. The defendants contend that Smith's ER 1091 work constitutes invalidating prior knowledge and use under § 102(a), invalidating prior public use and sale under § 102(b), and invalidating prior invention by Mr. Lloyd Garner under § 102(g). They rely, *see Defendants' Post–trial Brief*, at 31–37, on the following language from *Coffin v. Ogden*, 85 U.S. (18 Wall.) 120, 124, 21 L.Ed. 821 (1874):

> The invention or discovery relied upon as a defense, must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant. . . . The prior knowledge and use by a single person is sufficient. The number is immaterial.

This reliance is misplaced. The defendants have not met the *Coffin v. Ogden* test. They have not shown that the ER 1091 bits constituted an invention that was "complete, and capable of producing the result sought to be accomplished." *Id.*

31. For this reason, and for the reasons discussed in Findings of Fact 25 through 29, the defendants failed to meet their burden of proving that Smith's ER 1091 work invalidated the patent in suit. Smith's ER 1091 work did not constitute invalidating

prior knowledge or use under § 102(a), invalidating prior public use or sale under § 102(b), or invalidating prior invention under § 102(g).

(c) *The Chicago Pneumatic EM–1VC Bit*

32. The EM–1VC bit of the Chicago Pneumatic Tool Company was publicly used and sold more than one year prior to the date on which the application for the patent in suit was filed. *See* 35 U.S.C. § 102(b).

33. The EM–1VC bit is identical to the patent in suit in all but one respect. It has carburized steel milled teeth, while the patent in suit has tungsten carbide inserts.

34. Relying on *Hughes Tool Co. v. Ingersoll–Rand Company*, 305 F.Supp. 1119 (S.D.Tex.1969), *aff'd*, 437 F.2d 1106 (5th Cir.), *cert. denied*, 403 U.S. 918, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971), the defendants argue that these differences do not matter for the purposes of § 102. *Hughes Tool* involved the substitution of tungsten carbide inserts for steel milled teeth in a rotary–percussion bit. At page 1121 of the district court opinion, Judge Connally addressed the issue as follows:

> [The prior–art Brown patent] is, in my judgment, distinguished from the patent in suit in only one material respect. In Brown, the buttons are of steel and are a part of the bit body. In the patent in suit, the substitution is made of replacing the steel buttons with tungsten carbide inserts. As noted above, the use of tungsten carbide, diamond, or other very hard material as inserts for doing the actual cutting is not new and has been known in this and in other arts for years.

For that reason, Judge Connally ruled, the patent in suit in *Hughes Tool* was invalid for lack of novelty under § 102 and for obviousness under § 103.

The Fifth Circuit affirmed, but only as to lack of novelty. *See Hughes Tool, supra,* 437 F.2d at 1109. The basis of its ruling was as follows:

> First, in Brown the buttons—which protrude from the [main body of the bit, and strike and cut the] material in which the drilling is occurring—are of steel, and are a part of main body of the bit body, . . .

while in Kelly [the Hughes patent] the cutting instruments are tungsten carbide inserts implanted in the main body. It is readily seen that Kelly's inserts and Brown's buttons are very similar in structure, shape, and size. The differences between the two are in material used and in the mechanical concept of an implanted cutting instrument versus the cutting instrument fabricated as part of the body of the bit. The substitution of one material for another or the substitution of mechanical equivalents is not patentable. The District Court found that the use of inserts of hard material—such as hardened steel, diamonds and tungsten carbide—implanted in the body of a drill for doing the actual cutting is not new and has been known in the percussion bit art (and other arts as well) for many years. Considering the purposes of the buttons and the inserts—both employed as cutting instruments—the qualities of their combination with the other ingredients, the functions they are intended to perform, and whether persons reasonably skilled in the art would have known of the interchangeability of the two ingredients,[3] it is clear that the two are mechanical equivalents.

[3] The District Court found that the substitution of tungsten carbide inserts for the steel buttons was "perfectly obvious."

*Hughes Tool*, 437 F.2d at 1108–1109 (citations omitted) (footnote in original) (misprinted lines put in proper sequence).

35. The defendants originally relied on *Hughes Tool* to advance this anticipation argument in support of a motion for summary judgment. The argument was rejected at that time because there was still a factual dispute as to whether tungsten carbide inserts and carburized steel teeth constituted mechanical equivalents in non–percussion rotary drill bits. That factual dispute has since been resolved. The Court is convinced that tungsten carbide inserts and carburized steel teeth perform exactly the same mechanical functions in non–percussion rotary drill bits.

36. Under *Hughes Tool, supra,* this Court must, therefore, hold the patent in suit invalid for lack of novelty under 35 U.S.C. § 102. It feels compelled to note, however, that it does not consider the *Hughes Tool* analysis sound. As is discussed in Finding of Fact 17, the bit described in the patent in suit has three supposedly distinguishing characteristics. The EM–1VC does not have one of those—it does not have "cutters which have hard metal teeth inserted into the sockets in the cutters." Despite that fact, *Hughes Tool* dictates that the EM–1VC be held to invalidate the patent in suit under 35 U.S.C. § 102 because the teeth in the EM–1VC and those described in the patent in suit are "mechanical equivalents." Section 102, however, does not speak of "mechanical equivalents." It addresses itself to the question of whether the "invention" claimed has existed before. In the present case, it has not. By asking the question of whether a "mechanical equivalent" of the invention claimed has existed before, *Hughes Tool* injects the search for non–obviousness, a § 103 requirement, into the § 102 analysis.

This can be seen by reviewing the *Hughes Tool* language. In order to decide whether the buttons and the inserts are "mechanical equivalents," the court in *Hughes Tool* considers "whether persons reasonably skilled in the art would have known of the interchangeability of the two ingredients." *Id.* at 1108. That is precisely the inquiry required, however, by § 103. Section 103 instructs us to determine whether the claimed invention is obvious by examining the differences between the prior art and the patent in suit from the perspective of "a person having ordinary skill in the art." If one needs any further evidence that obviousness considerations are being injected into the § 102 analysis, it is provided by *Hughes Tool* 's footnote 3. The court, in the midst of determining whether the interchanged items are "mechanical equivalents," footnotes directly to the district court's additional finding that the substitution of one for the other was "perfectly obvious." Through use of the "mechanical equivalents" test, the court in *Hughes Tool,* though using the language of § 102, was, in fact, holding the patent in suit invalid for obviousness. Although that may have been the right result, *see* Dunner, Gambrell, & Kayton, *Pat.L.Persp.* § A.1[1], at 23–24 (1971 Dev.), analytical clarity dictates that it should have been reached under § 103, not § 102.

### 2. Section 103–Obviousness

37. After the above discussion, it should come as no surprise that the defendants also contend that the patent in suit is invalid for obviousness under § 103. Section 103 provides as follows:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

38. As was indicated in Finding of Fact 18, the parties agree that the patent in suit is a combination of individual elements, each of which was known separately in the prior art. Essentially, the defendants contend that it would have been obvious to one of ordinary skill in the art to select each of these individual elements from the prior art and combine them in the way claimed in the patent. Both the Supreme Court and the Fifth Circuit have made it clear that when a combination invention is claimed, "special strictness must be applied to be certain that the claims satisfy all of the prerequisites of patentability, and particularly Section 103." *Parker v. Motorola, Inc.,* 524 F.2d 518, 531 (5th Cir. 1975), *cert. denied,* 425 U.S. 475, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976). As the Supreme Court said in both *Great A. & P. Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950), and

*Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976):

Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.... A patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men.

In order to be patentable, "the combined elements [in a combination invention] must perform a new or different function, produce unusual or surprising consequences, or cause a synergistic result." *John Zink Co. v. National Airoil Burner Co.*, 613 F.2d 547, 551 (5th Cir. 1980), and cases cited therein.

■ 39. The ultimate determination of obviousness is one of law, *Great A. & P. Tea Co., supra*, but its resolution rests on three factual inquiries: (1) the scope and content of the prior art, (2) differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). "[S]econdary considerations," such as "commercial success, long felt but unsolved needs, failure of others, etc.," *id.*, may shed light on the obviousness determination, but they "will not, without more, satisfy the § 103 nonobviousness requirement." *Huron Machine Products, Inc. v. A. and E. Warbern, Inc.*, 615 F.2d 222, 225 (5th Cir. 1980), and cases cited therein.

40. In the present case, the inquiry required by *Graham v. John Deere Co., supra*, can be conducted without much difficulty. The scope of the prior art may or may not extend to the rotary–percussion bits discussed in *Hughes Tool, supra*. *See Cathodic Protection Service v. American Smelting & Refining Co.*, 594 F.2d 499, 507–508 (5th Cir.), *cert. denied*, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979). It does, however, without question, extend to all three–cone drill bits, as well as all patents and publications relating to three–cone drill bits. The content of the prior art includes, as has been discussed, each of the individual elements of the claimed combination.

41. More specifically, the scope and content of the prior art include both the Russian drill bits handbook discussed in Findings of Fact 22 through 24 and the Chicago Pneumatic EM–1VC bit discussed in Findings of Fact 32 through 36. They also include U.S. Patent No. 3,134,447 to McElya (the McElya patent), Exhibit P–4, and an article entitled "Rock-bit Design, Selection, and Evaluation" by H. G. Bentson, Exhibit P–10. These latter two items of prior art, like the former two items, see Finding of Fact 21, were not reviewed by the patent office when it made its determination of patentability.

42. The McElya patent discloses a three–cone rotary rock bit with offset and tungsten carbide inserts of an ovoid or ogive shape. Those inserts, according to Dr. Pennington, the plaintiff's expert, have a "minimum projected area" within the meaning of the patent in suit. Tr. at 2318. The McElya patent does not specify whether the extension of the inserts is equal to or greater than one–half of the insert diameter.

43. The Bentson article, presented in May 1956 to an industry trade group and used since then to train Smith engineers, surveyed what was known to the industry about drill bit design in that year. At page 312 of his article, Bentson published a chart, Exhibit P–10, which, according to the author, "illustrate[s] where variations in design factors generally occur within the range of soft to hard bit types." The chart discloses that the softer the formation, the longer the teeth and the greater the offset being incorporated into the bit. It also shows that in 1956 inserts were only being used in the hardest formations.

44. Moving to the second inquiry required by *Graham v. John Deere, supra*, the difference between the prior art and the claims at issue is simply that the prior art included the constituent elements of the combination, but it did not include the combination itself. As was discussed in Find-

ing of Fact 33, the sole difference between the prior art EM–1VC bit and the patent in suit is that the former has carburized steel teeth, while the latter has tungsten carbide inserts. As was discussed in Findings of Fact 23 and 42, respectfully, Figure 132 of the Russian drill bits handbook and the McElya patent differ from the patent in suit in that the inserts pictured therein do not have a protrusion of at least one–half their diameter.

45. The third inquiry required by *Graham v. John Deere Co., supra,* is no less easy to summarize. The Bentson article and the testimony of various witnesses, in particular Dr. Pennington, reflect that the level of ordinary skill in the art was and is high. It cannot be disputed that those of ordinary skill in the art in 1966 and 1967, knew, at a minimum, that:

(a) greater offset was desirable in softer formations,

(b) greater protrusion was desirable in softer formations,

(c) tungsten carbide inserts performed the same mechanical function as similarly–shaped carburized steel teeth, and

(d) tungsten carbide inserts lasted longer, but were more likely to break, than similarly–shaped carburized steel teeth.

They knew of the advantages and disadvantages of the various sizes and shapes of teeth and they knew of the benefits and costs of using milled tooth bits and insert bits.

46. The defendants were among those of ordinary skill in the art in 1966 and 1967. Both were, at that time, attempting to design a bit similar to that claimed in the patent in suit. Defendant Smith's ER 1091 work has already been discussed. *See* Findings of Fact 25 through 31. Defendant Dresser was, in fact, during the same time period, undertaking to design an offset bit having tooth shaped inserts with an even longer extension than that contemplated by the plaintiff or defendant Smith. On August 26, 1966, Dresser wrote to General Electric, from which it purchased tungsten

carbide, "We are very interested in expanding our carbide bit line into the medium and medium hard formations." Exhibit Y–2. In a Dresser inter–office memo dated December 27, 1966, Exhibit Y–3, Mr. Roy Wolff, a senior field engineer, wrote:

We believe that all 'M' [medium formation] and 'H' [hard formation] type milled tooth rock bits of today will eventually be replaced by a sealed bearing insert type bit with longer shaped inserts that are less brittle to minimize breakage and allow journal offset. This is our observation from the field and suggest that R&D consider that for immediate action.

The layout drawing for Dresser's S–8 bit, Exhibit Y–4, showing ⅛″ offset and chisel inserts with 5/16″ protrusion and ½″ diameter is dated August 30, 1967. The S–8 drawings were released to the manufacturing and production departments of Dresser for tooling and manufacture of the bit on October 13, 1967. *See* Exhibit Y–5. On that same date, an engineering requisition for twenty S–8 bits was issued. *See* Exhibit Y–8.

47. Thus, at the same time as the plaintiff was developing the patent in suit, both defendants were independently developing bits encompassing the same inventive thought. This evidence of contemporaneous independent development, of course, supports a finding of obviousness. *See Fred Whitaker Co. v. E. T. Barwick Industries, Inc.,* 551 F.2d 622, 628 (5th Cir. 1977); *Becton, Dickinson & Co. v. Sherwood Medical Industries, Inc.,* 516 F.2d 514, 521 n.19.

48. The plaintiff does not contend that its combination invention performs "a new or different function" or causes "a synergistic result." *John Zink Co. v. National Airoil Burner, supra.* It does, however, maintain that its bit produces "unusual or surprising consequences." *Id. See* Finding of Fact 38. It says that its bit is not invalid for obviousness because those skilled in the art in the mid–1960's did not think it could work. They believed, Reed argues, that tungsten carbide inserts would break if used in a bit of the type described in the patent in suit and assumed that the bit's penetration rate

would be uneconomically slow. *See Plaintiff's Post–trial Brief*, at 35–36.

49. In support of its position, Reed offers a written "Certificate of Invention" form, Exhibit 44, filled out in 1968 by Mr. Eugene Ott, an engineer and metallurgist for Dresser, in support of Dresser's attempt to obtain a patent on the bit Reed now accuses of infringement. On page four of that form, under the heading "Point of Novelty," Mr. Ott did, indeed, write as follows:

(1) The rough running and scraping caused by the offset bearing operation and the greater extension of the carbide above the parent metal lands had led those skilled in the design and use of insert type bits to believe that insert breakage would be very severe. (Sintered tungsten carbide being extremely hard and not renowned for its toughness).

(2) Assuming that insert breakage was not a paramount problem, it was assumed that since the compact extension would be less than that of a milled, steel, tooth, the penetration rate of the bit would necessarily be slower or the bearing life shortened due to increased operating conditions necessary to maintain comparable penetration rate.

50. These statements were written by Mr. Ott only after he was instructed by his superior, Mr. Tolbert, to complete the "Certificate of Invention" form. The memo from Mr. Tolbert to Mr. Ott, Exhibit 47, is at least as instructive as the "Certificate of Invention" is as to what those skilled in the art in 1968 thought of a bit of the type claimed in the patent in suit:

We have not considered there would be anything patentable about the S–88 bit design, but its success in the field dictates that patentability be looked into by the Patent Department. Please make up a full Certificate of Invention.

51. The plaintiff may be correct when it urges that Mr. Ott's statements constitute admissions against interest as to defendant Dresser. *See* Fed.R.Evid. 801(d)(2). As to

defendant Smith, however, they do not; they constitute hearsay. *See* Fed.R.Evid. 801(c) and (d). They are, moreover, of little, if any, probative value. The statements made by Dresser's attorney in seeking the same patent, Exhibits 54–56, are even less useful.

52. The plaintiff also contends that the "secondary considerations" spoken of in *Graham v. John Deere, supra,* weigh against a finding of obviousness. There are two problems with this contention. First, as was discussed in Finding of Fact 39, those considerations, without more, do not support a finding of non–obviousness. Second, the plaintiff introduced virtually no evidence of the "secondary considerations" it wishes the Court to consider. It did not prove "commercial success, long felt but unsolved needs, [or] failure of others." *Id.*

53. Having conducted the inquiry required by *Graham v. John Deere Co., supra,* the Court can only conclude that the patent in suit is invalid for obviousness. It "would have been obvious at the time [it] was made to a person having ordinary skill in the art." 35 U.S.C. § 103. The elements combined in the patent in suit do not "perform a new or different function, produce unusual or surprising consequences, or cause a synergistic result." *John Zink Co. v. National Airoil Burner Co., supra.*

3. *Section 112–Lack of Disclosure*

54. The defendants also argue that the patent in suit is invalid for lack of disclosure under 35 U.S.C. § 112. Paragraph one of Section 112 provides as follows:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

55. The defendants maintain that two separate aspects of the patent in suit violate paragraph one. First, they contend

that the failure of the patent to disclose the grade of tungsten carbide used to construct the inserts violates the "best mode" requirement. Second, they say that the inclusion of the phrase, "sufficient strength to minimize breakage and a minimum projected area both axially and circumferentially," violates both the "description" and "enablement" requirements.

56. In regard to the defendants first complaint, the evidence did show that, during the projects which resulted in the "invention," a change was made in the grade of the tungsten carbide material to be used in the inserts, from Grade 248 to Grade 55B. Grade 55B is a softer, less brittle, tungsten carbide formulation.

57. The evidence also showed, however, that those skilled in the art were already fully aware of the existence and characteristics of Grade 55B tungsten carbide. In fact, both defendants were already using this grade of tungsten carbide material for most or all of their own inserts. The evidence further demonstrated that the specification of any particular grade of tungsten carbide material to be used in a bit is considered a matter of choice by the engineer designing the bit. This is buttressed by the fact that there seems to be no practice of disclosing the grade of insert material utilized when patenting tungsten carbide inserts or bits including tungsten carbide inserts. For example, patents issued to the defendants on their inserts and insert bits, see Smith Patent No. 3,388,757 and Dresser Patent No. 3,389,761 in Exhibit 4, did not disclose the grade of insert material utilized. Moreover, the record established that both the plaintiff and the defendants regularly examine their competitors' products in order to determine the grade of insert material being utilized. Since the patent in suit did not issue until two years after the Reed SCM bits were already in the field, presumably the defendants already knew exactly what insert material was being utilized before they were ever aware of the patent itself.

58. There is simply no showing on this record that the failure of Mr. Schu-

macher to disclose the grade of insert material used for the inserts of his bit would or did hamper, in any way, the practice of the invention by one skilled in the art. It did not constitute a violation of the "best mode" requirement of paragraph one of 35 U.S.C. § 112.

59. As to the defendants' second complaint, the inclusion of the phrase "sufficient strength to minimize breakage and a minimum projected area both axially and circumferentially," a different showing has been made. Many of the multifold problems with this phrase are obvious upon reading it; five that are not will be discussed here. First, the bit described in the patent in suit was, according to the plaintiff, the solution to a problem which was previously thought unsolvable: unacceptable insert breakage in offset drill bits with tungsten carbide inserts. If this patent is to be viewed as the "miracle solution" to that problem, the first portion of the phrase appears entirely unacceptable. It is simply insufficient to say that the inserts must have "sufficient strength to minimize breakage."

60. Second, although the first portion of the phrase is clear as to what is being looked for, the second portion is not. "Strength" is a term which, when used in reference to inserts, has a generally accepted meaning in the art of drill bit design. "Projected area," according to the testimony before this Court, is not. It was coined either by Mr. Schumacher or his patent attorney while preparing the application for the patent in suit. Tr. at 366.

61. Third, despite the clear wording of claim 1, "minimum projected area" is not, in fact, what is embodied in the patent in suit. Nor is it what is desired. If the inserts in a bit actually had "minimum projected area," they would not protrude from the face of the cutter. What the patent is intended to tell the practitioner is, according to Dr. Pennington, "Don't put any more on there than you need." What is both embodied and desired is some, but not too much, "projected area." How much? The patent does not say.

62. Fourth, the same is true of strength. The use of the word "minimize" in the term "sufficient strength to minimize breakage" could suggest to some practitioners that the more strength, the better. The use of the word "sufficient" in the same phrase, however, indicates, and the testimony establishes, that the patent in suit is not intended to call for maximum strength. What is both embodied and desired is some, but not too much, strength. How much? Once again, the patent does not say.

63. Finally, the plaintiff's witnesses, in particular Mr. Schumacher and Dr. Pennington, testified numerous times as to the meaning of this phrase. *See, e. g.*, Tr. at 138–141, 365–369, 406–408 (Mr. Schumacher); Tr. at 977–980, 1001, 1056–1060, 1063, 1069–71, 1127–1130 (Dr. Pennington). They explained, as best they could, in response to repeated questioning by defense counsel, how one skilled in the art can determine if a particular insert has "sufficient strength to minimize breakage and a minimum projected area both axially and circumferentially." When fully condensed, their explanations amount to the following: if the insert works, it has the claimed characteristics; if it does not work, it does not.

64. Recognizing that the challenged phrase may be fatally weak, the plaintiff argues that, when read in conjunction with the specification, it is "clearly used as a generic term to encompass the three specific insert shapes disclosed in the patent: substantially conical; pyramid; and 'shapes approximating a cone, such as an ogive.' " *Plaintiff's Reply Brief*, at 33–34. That, however, is not so. To begin with, the specification in no way limits the scope of the challenged phrase to the three insert shapes specifically disclosed in the patent. Moreover, Dr. Pennington, the plaintiff's own expert, testified that the term "minimum projected area" would encompass all of the following insert shapes: conical, double conical, pyramidal, ogival, and, up to a certain amount of crest, chisel. Tr. at 1062. The term "sufficient strength to minimize breakage" would, of course, do the same.

65. Assuming *arguendo* that claim 1 is invalid for lack of specificity, the plaintiff also maintains that claim 4, upon which it bases its allegation of infringement, is not similarly void. That is "because [claim 4] further defines and limits the minimum projected area shape to be a definite shape, i. e., 'substantially conical.' " *Plaintiff's Post–argument Memorandum*, at 7. But as the defendants cogently point out in their post–argument letter of March 25, 1980, at 2, various and sundry inserts can have a "substantially conical" shape, while only one of those inserts will have the "minimum projected area" necessary to do the job. Claim 4, then, is no more valid than claim 1.

66. The patent in suit is invalid for lack of disclosure under 35 U.S.C. § 112. It meets neither the description nor the embodiment requirement of paragraph one. It simply does not contain, as § 112 requires,

a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or to which it is most nearly connected, to make and use the same.

## G. INFRINGEMENT, LACHES, AND ESTOPPEL

67. As the Court has concluded that the patent in suit is invalid, it will not address the question of infringement. *See Beckman Instruments, Inc. v. Chemtronics, Inc., supra*; Finding of Fact 20. Nor will it address the questions of laches or estoppel.

## II. CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action under 28 U.S.C. § 1338. Venue has not been contested.

2. Under 35 U.S.C. § 282, the patent in suit is presumed to be valid, although the presumption is substantially diminished when, as in the instant case, the defendants rely on prior art and evidence not presented to the patent office. *See* Finding of Fact 19; *Cathodic Protection Services v. Ameri-*

can *Smelting & Refining Co.*, 594 F.2d 499, 505 (5th Cir.), *cert. denied*, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979), and cases cited therein. It is the defendants' burden to prove invalidity. 35 U.S.C. § 282.

3. The Russian drill bits handbook introduced by the defendants, Exhibit P–7, does not constitute an invalidating anticipation under 35 U.S.C. § 102. *See* Finding of Fact 24.

4. Smith's ER 1091 work did not invalidate the patent in suit for lack of novelty under 35 U.S.C. § 102(a)(b) or (g). *See* Finding of Fact 31.

5. Under the law of the Fifth Circuit, as established by *Hughes Tool Co. v. Ingersoll Rand Co.*, 437 F.2d 1106 (5th Cir.) *cert. denied*, 403 U.S. 918, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971), the Chicago Pneumatic EM–1VC bit renders the patent in suit invalid for lack of novelty under 35 U.S.C. § 102. *See* Finding of Fact 36.

6. The patent in suit is invalid for obviousness under 35 U.S.C. § 103. *See* Finding of Fact 53.

7. The patent in suit is not invalid for lack of disclosure under 35 U.S.C. § 112 because it fails to disclose the grade of tungsten carbide used to construct the inserts called for therein. *See* Finding of Fact 58.

8. The phrase "sufficient strength to minimize breakage and a minimum projected area both axially and circumferentially of said cutter," as used in the patent in suit, renders the patent invalid under 35 U.S.C. § 112. *See* Finding of Fact 66.

9. The Court need not address the question of infringement. *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 558 n.4 (5th Cir.), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970). Nor need it address the question of laches or estoppel.

10. Judgment is hereby entered in favor of the defendants.

11. In the event that any of the foregoing Findings of Fact also constitute Conclu-

sions of Law, they are adopted as such. In the event that any of the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such.