REED TOOL COMPANY,
Plaintiff-Appellant,

v.

DRESSER INDUSTRIES, INC. and
Smith International, Inc.,
Defendants-Appellees.

No. 80–2170.

United States Court of Appeals,
Fifth Circuit.

April 8, 1982.

Vinson & Elkins, A. H. Evans, W. Ronald Robins, Houston, Tex., for plaintiff-appellant.

Arnold, White & Durkee, John F. Lynch, Houston, Tex., for Dresser Ind.

Christie, Parker & Hale, Andrew J. Belansky, Pasadena, Cal., for Smith Intern., Inc.

Before GARZA and RANDALL, Circuit Judges *.

GARZA, Circuit Judge:

Reed Tool Company ("Reed"), a Texas corporation primarily engaged in the business of manufacturing and selling rotary equipment, brought suit against two of its principal competitors, Dresser Industries, Inc. ("Dresser") and Smith International, Inc. ("Smith"), alleging infringement of United States Patent No. 3,495,668.[1]

The patent in question relates to a three-cone rotary rock bit used to drill oil and gas wells.[2] At trial, the defendants denied infringement and alleged invalidity and unenforceability of the patent both on equitable and statutory grounds. The district court found the patent to be invalid under several

theories,[3] and the other issues in the case, including infringement, were never reached. Because this court finds the patent invalid, we affirm the lower court's decision.

It is apparent after reviewing the district court's opinion that much time and effort was devoted to outlining both the facts of this case and the evolution of rotary rock bit design.[4] Rather than try to improve upon them, we instead incorporate them by reference and will discuss only those facts as are pertinent to our decision.

Three-cone rotary rock bits have been used to drill oil and gas wells for nearly half a century. The evidence at trial particularly focused on two types of three-cone bits—milled tooth bits and insert bits.

For many years, the principal type of rotary rock bits used in the drilling industry were milled tooth bits. The cutting structure of these bits consists of rows of elon-

---

* Due to his death on December 22, 1981, Judge Ainsworth, did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1. The suit was originally brought as two separate cases, but later consolidated by court order.

2. The bit has the following appearance:

Defendants have only been accused of infringing claims 4 through 6.

4. A drill bit according to claim 1, wherein said cutting elements have a substantially conical shaped protrusion.

5. A drill bit according to claim 4, wherein the cone angle of said conical shaped protrusions is substantially in the range from 45 to 75 degrees.

6. A drill bit according to claim 4, wherein the outermost portion of each of said conical shaped protrusions is blunted.

The infringed claims, however, are dependent upon claim 1:

1. A drill bit, comprising a head, at least one roller cutter, bearing means for rotatably mounting said roller cutter on said head, the axis of rotation of said cutter extending inwardly and away from said head generally toward and skewed from the axis of rotation of said head, said cutter having a plurality of hard metal cutting elements inserted therein, each of said hard metal cutting elements in at least one row having a protrusion of at least one-half of its diameter, sufficient strength to minimize breakage and a minimum projected area both axially and circumferentially of said cutter.

3. More specifically, the district court held that the patent was invalid for lack of novelty, obviousness and lack of disclosure under 35 U.S.C. §§ 102, 103 and 112.

4. *Reed Tool Co. v. Dresser Industries, Inc.*, 499 F.Supp. 935, 937–40 (S.D.Tex.1980).

gated steel teeth which are integrally formed with the cutter. The outer surface of the teeth and of the cutter are carburized or "case hardened" to increase their wear resistance. The tooth type structure has the advantage of being comparatively strong, since the teeth are actually an integral part of the steel cutter from which they extend, and since the uncarburized steel core of each tooth lends ductility to the structure so that it can absorb shocks and shear forces encountered in drilling. Because hard and soft formations yield more easily to different drilling forces, the design of these milled tooth bits varied in accordance with the type of formation for which they were intended. Invariably, however, milled tooth bits employed cutter skew or offset in order to gouge and scrape away rock formations.[5]

Prior to the introduction of insert bits, milled tooth bits were the workhorses in oil well drilling. Utilization of milled tooth

bits over the years, however, indicated that such bits were less than ideal for drilling hard rock formations. No matter how well-designed they were, milled tooth bits were limited by the strength of the metal with which they were constructed. In drilling the hard rock formations, the carburized steel of which the bits were constructed ground down very quickly. In very hard rock formations, a milled tooth bit might drill for only a few feet, after which it would have to be pulled out of the hole and replaced. This was very expensive, not only in terms of the number of bits required for drilling a well, but also in terms of the time required for each "round trip" in which the drill string, often thousands of feet in length, would have to be removed from the hole and disconnected, joint by joint, so that the drill bit could be changed.

This problem was substantially eliminated by the introduction of the insert bit in the early 1950's. In contrast to the way

---

**5.** "Skew" and "offset" refer to the fact that the axis of rotation of each of the three cone-shaped cutters is skewed (an angular measurement) or offset (a linear measurement) from the vertical centerline (axis of rotation) of the bit by about ⅛ inch or more. This prevents the individual cutters from rolling true upon the bottom of the hole, thereby causing them to scrape as the bit is rotated. The effect of offsetting was to greatly increase the rate of drilling, especially in softer rock formations.

The following is illustrative of the difference between offset and non-offset drill bits:

milled tooth bits are manufactured, with portions of thick-walled cutters being machined away to create integrally-formed cutter teeth, insert bits are manufactured by boring sockets into the cutters, heating them up until the holes expanded, and then dropping in inserts of an extremely hard substance, tungsten carbide. When the sockets cooled, the holes would contract and the inserts would be permanently affixed in place. Although these inserts are much harder than the carburized steel from which the cutters are formed, they are also more brittle. For this reason, the early inserts were closely spaced and did not protrude far from the conical cutter. Moreover, the cutters were not skewed or offset; instead of gouging and scraping away at rock formations, drilling was accomplished by crushing the rock under the weight of heavy drill collars.

Because there was not as great a need for more wear-resistant teeth in soft and medium-density formation drilling, insert bits were not, at first, used to drill in these formations. Nevertheless, as time went on, the various characteristics which had been used to adapt milled tooth bits to softer formations were in turn incorporated into insert bits. Finally, in late 1967, appellant introduced the Reed SCM bit.[6] Designed to drill in medium-density formations, appellant claims it was the first commercially successful bit with extended inserts.

**6.** Although the Reed SCM bit was first commercially introduced in late 1967, the application for the patent was not filed until July 5, 1968.

**7.** *See* note 3 *supra.*

**8.** This presumption is based upon the acknowledged experience and expertise of the Patent Office personnel, and recognition that patent approval is a species of administrative determination supported by evidence. *Parker v. Motorola, Inc.,* 524 F.2d 518 (5th Cir. 1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976); *Beckman Instruments, Inc. v. Chemtronics, Inc.,* 439 F.2d 1369 (5th Cir. 1970), *cert. denied,* 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970); *Johns-Manville Corp. v. Cement Asbestos Products Co.,* 428 F.2d 1381 (5th Cir. 1970); *Neff Instrument Corp. v. Cohu Electronics, Inc.,* 298 F.2d 82 (9th Cir. 1961);

The lower court, however, invalidated the patent using several theories.[7] On this appeal, Reed claims that the Court below erred: (1) by ignoring the statutory presumption of validity normally attaching to patents which survive the scrutiny of the Patent Office, 35 U.S.C. § 282; (2) by concluding that the claims of the patent were invalid for obviousness, 35 U.S.C. § 103; (3) by finding the patent invalid due to lack of novelty, 35 U.S.C. § 102; and (4) by holding that the patent was invalid for lack of disclosure, 35 U.S.C. § 112. It is unnecessary, however, for this court to consider all of these contentions; support for any one of the latter three mandates affirmance of the result below irrespective of the soundness of the district court's reasoning as to the other two. Accordingly, we express no opinion on those issues not discussed.

### Presumption of Validity

Before a patent may be successfully challenged, the statutory presumption of validity must first be overcome. While it is true that 35 U.S.C. § 282 presumes all patents to be valid,[8] the presumption is not irrebuttable. It vanishes once the party attacking the patent demonstrates that the Patent Office failed to consider pertinent prior art at the time it made its evaluation.[9] In order to be successful, however, the evidence offered must be more than a preponderance. It must not be cumulative, and any existing doubts are to be resolved against the attacking party.[10]

*Georgia Pacific Corp. v. United States Plywood Corp.,* 258 F.2d 124 (2nd Cir. 1958), *cert. denied,* 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

**9.** *Ludlow Corp. v. Textile Rubber & Chemical Co., Inc.,* 636 F.2d 1057 (5th Cir. 1981); *John Zink Co. v. National Airoil Burner Co.,* 613 F.2d 547 (5th Cir. 1980); *Steelcase, Inc. v. Delwood Furniture Co., Inc.,* 578 F.2d 74 (5th Cir. 1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979); *Parker v. Motorola, Inc.,* 524 F.2d 518 (5th Cir. 1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976).

**10.** *Ludlow Corp. v. Textile Rubber & Chemical Co., Inc.,* 636 F.2d 1057 (5th Cir. 1981); *John Zink Co. v. National Airoil Burner Co.,* 613 F.2d 547 (5th Cir. 1980).

■ Although this burden is normally a difficult one to overcome, it is not insurmountable. In the instant case, appellees have demonstrated that the patent examiner had not considered: (1) prior art showing offset in an insert bit; (2) prior art showing offset in a bit having extended conical cutting elements; (3) evidence of the independent and simultaneous developments by others in the drill bit art; and (4) evidence to establish the steady progression in the rock bit art to adapt insert bits to softer formations by incorporating into insert bits accepted design concepts. Because these items go to the very heart of this case, it can be said that no error of law was made by the trial court as to the presumption of validity. The presumption in this case, therefore, must be regarded as non-existent.

### Obviousness

■ The district court also found, *inter alia*, that the patent was invalid for obviousness under 35 U.S.C. § 103. Under § 103, a patent may not be issued

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

But while the ultimate question of patent validity is one of law, application of the nonobviousness test depends upon factual inquiries. *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Cathodic Protection Service v. American Smelting*, 594 F.2d 499 (5th Cir. 1979), *cert. denied*, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979); *Steelcase, Inc. v. Delwood Furniture Co., Inc.*, 578 F.2d 74 (5th Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979); *Robbins Co. v. Dresser Industries, Inc.*, 554 F.2d 1289 (5th Cir. 1977); *Johns-Manville Corp. v. Cement Asbestos Products Co.*, 428 F.2d 1381 (5th Cir. 1970). The factual inquiries are: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the art. *Graham v. John Deere Co.*, 383 U.S. at 17, 86 S.Ct. at 693.[11]

Reed's patent is conceded to be a "combination" patent; *i.e.*, a patent involving a combination of elements found in prior art. While such patents have been upheld in the past,[12] the claims have been scrutinized "with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.... A patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784, 790–91 (1976).[13]

Considering, then, the factual inquiries mandated by *Graham*, we note that both sides agree that the scope of the prior art includes all three-cone drill bits, as well as patents and publications relating to three-cone drill bits. They also agree that the difference between the prior art and the

---

11. Secondary considerations include skepticism of experts, commercial success, long felt but unresolved needs, and the failure of others. *Control Components, Inc. v. Valtek*, 609 F.2d 763 (5th Cir. 1980), *cert. denied*, 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). The district court found, however, that Reed "introduced virtually no evidence of the 'secondary considerations' it wishes the court to consider." Moreover, while such secondary considerations may warrant consideration in a close case, they cannot validate a patent if the claimed subject matter fails to meet the statutory standard of nonobviousness. *Waldon, Inc. v. Alexander Manufacturing Co.*, 423 F.2d 91, 95 (5th Cir. 1970).

12. *E.g., John Zink Co. v. National Airoil Burner Co.*, 613 F.2d 547 (5th Cir. 1980); *Parker v. Motorola, Inc.*, 524 F.2d 518, *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976).

13. *See also Robbins Co. v. Dresser Industries, Inc.*, 554 F.2d 1289 (5th Cir. 1977); *Parker v. Motorola Inc.*, 524 F.2d 518, *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976); *Spray-Bilt, Inc. v. Ingersoll-Rand World Trade, Ltd.*, 350 F.2d 99 (5th Cir. 1965).

claims at issue is simply that the prior art included the constituent elements of the combination, but it did not include the combination itself. What they disagree about is the third criterion; *i.e.*, the level of ordinary skill in the art.

Reed's position, with respect to this last factor, is that those skilled in the art at that time believed that the claimed combination of offset cutters with tungsten carbide inserts, having insert protrusion for drilling the softer rock formations, would not drill effectively because breakage of the inserts would be excessive and would render the bit uneconomical. The trial court's findings, however, cut the other way. As the lower court noted:

> The Bentson article and the testimony of various witnesses, in particular Dr. Pennington, reflect that the level of ordinary skill in the art was and is high. It cannot be disputed that those of ordinary skill in the art in 1966 and 1967, knew, at a minimum, that:
>
> (a) greater offset was desirable in softer formations,
>
> (b) greater protrusion was desirable in softer formations,
>
> (c) tungsten carbide inserts performed the same mechanical function as similarly-shaped carburized steel teeth, and
>
> (d) tungsten carbide inserts lasted longer, but were more likely to break, than similarly-shaped carburized steel teeth.
>
> They knew of the advantages and disadvantages of the various sizes and shapes of teeth and they knew of the benefits and costs of using milled tooth bits and insert bits.

■ Evidence below indicates that the Reed SCM bit was merely the next step in a pattern set earlier on. The three characteristics of the Reed patent were: (1) an insert bit; (2) with offset; and (3) having inserts that extended further than previous models. Yet prior to its introduction, a Russian

drill bits handbook was published which described a three-cone rotary rock bit with offset and tungsten carbide inserts. The only difference was that there was no indication in that publication as to whether they, in the words of the patent in suit, have "a protrusion of at least one-half of [their] diameter." There was also other evidence that others skilled in the art, including defendants, were also independently approaching the design of an insert bit for softer formations in the same way as Reed did. As this court noted in *John Zink Co. v. National Airoil Burner Co.*, 613 F.2d 547, 551 (5th Cir. 1980): "The combined elements [of a combination patent] must perform a new or different function, produce 'unusual or surprising consequences,' or cause a synergistic result." Strictly scrutinizing the patent at hand, it would appear that this test has not been met.

Because this court fails to find the factual inquiries made below clearly erroneous,[14] the lower court's result is AFFIRMED.

---

14. Fed.R.Civ.P. 52(a); *Cathodic Protection Service v. American Smelting & Refining Co.*, 594 F.2d 499, 506 (5th Cir. 1979), *cert. denied*, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979).